UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X     Case No.:
ALANA LAMBERT; KIMARAH LeROUGE; and
ERICA WILTZ, *on behalf of themselves and all others*
*similarly situated,*

                                Plaintiffs,     **COMPLAINT**

           -against-     **FLSA COLLECTIVE ACTION**
                                        **& RULE 23 CLASS ACTION**

NEW START CAPITAL LLC F/K/A TITAN
CONSULTING GROUP LLC; ROBERT RUSSINI, *an*     **JURY TRIAL DEMANDED**
*individual*; DANI ADELSTEIN, *an individual*; and
PHIL STEIN, *an individual,*

                         Defendants.
-------------------------------------------------------------------X

       Plaintiffs ALANA LAMBERT, KIMARAH LeROUGE and ERICA WILTZ (hereinafter

"Plaintiffs"), on behalf of themselves, and others similarly situated, and complaining of

Defendants NEW START CAPITAL LLC, F/K/A TITAN CONSULTING GROUP, LLC,

ROBERT RUSSINI, , DANI ADELSTEIN, and PHIL STEIN, (collectively, "Defendants"), by

their attorneys, BELL LAW GROUP, PLLC, allege as follows:

### NATURE OF THE ACTION

       1.     Plaintiffs bring this action on behalf of themselves, and all others similarly situated

for Defendants' systemic and continuous violations of:

         a.   the minimum wage and overtime provisions of the Fair Labor Standards Act

            ("FLSA"), 29 U.S.C. § 207 *et seq.*;

         b.   the minimum wage and overtime provisions of the New York Labor Law

            ("NYLL") and N.Y. Comp. Codes R. & Regs. ("NYCCRR") Tit. 12, § 142-2.2;

c.  the requirement that employers furnish employees with a written statement at the time of hiring, containing specific categories of information under the NYLL § 195(1), codified as the New York Wage Theft Prevention Act (the "NYWTPA");

d.  the requirement that employers furnish employees with wage statements on each payday containing specific categories of accurate information under the NYLL § 195(3);

e.  breach of contract;

f.  unlawful misrepresentation and fraudulent misrepresentation; and

g.  any other cause(s) of action that can be inferred from the facts set forth herein.

2.      Plaintiff Lambert additionally brings claims on an individual basis, for inter alia: Defendants' continuous and egregious violations of the sex/gender discrimination and retaliation provisions of the New York State Human Rights Law ("NYSHRL") and the New York State City Rights Law ("NYCHRL").

3.      Plaintiff Wiltz likewise bring claims on an individual basis for, inter alia: i) Defendants' continuous and egregious violations of the race/national origin discrimination and retaliation provisions of the NYSHRL and NYCHRL; and ii) disability discrimination and retaliation provisions of the NYSHRL and NYCHRL.

4.      Plaintiffs' claim against Defendant Russini and Defendant Adelstein arise under the NYSHRL for aiding and abetting discrimination.

## PRELIMINARY STATEMENT

5.      New Start Capital, LLC F/K/A Titan Consulting Group LLC ("New Start") hired Plaintiffs and hundreds of other salespersons, debt specialists, and debt negotiators to enroll

2

debtors into their program, at high fees, which resulted in a high profit for the Defendant.

6.      Although Defendant New Start annually generates thousands of dollars in gross revenue, it refuses to honor its legal obligation to comply with federal and state other wage laws, systematically depriving past and current New Start employees with wages that they are entitled to as a matter of law.

7.      Specifically, Defendant New Start has an unlawful policy of refusing to pay employees the minimum wage for all hours worked, proper overtime wages or correctly reporting their hours worked. Specifically, Defendant paid Plaintiffs for only forty (40) hours per week, regardless of how many hours were actually worked. Defendants did not maintain records or issue compensation at *any* rate for hours worked over forty in a week. Accordingly, Defendants failed to compensate Plaintiffs at both the required statutory minimum wage and overtime rate for all hours over forty in a workweek, in violation of the New York Labor Law ("NYLL") and the Federal Fair Labor Standards Act ("FLSA"). Defendant New Start gave Plaintiffs a second check for commissions earned, but that second check was not based on overtime hours worked, and therefore cannot satisfy Defendants' obligations under the NYLL and FLSA.

8.      Worse still, Defendants breached the Commission Agreement which they provided to Plaintiffs by failing to provide the full commission amount – for all applicable clients – and failing to pay the commission in the time set forth in the Commission Agreement.

9.      In addition, Defendant New Start failed to furnish Plaintiffs with accurate and/or complete wage statements as required under the NYLL on each payday. Likewise, Defendant New Start failed to furnish Plaintiffs with accurate and/or complete wage notices, upon hiring, and annually thereafter, as required under the NYLL.

10.     Accordingly, Plaintiffs now bring this action on behalf of themselves, and all similarly situated employees, pursuant to the FLSA, 29 U.S.C. §§ 201 et seq., and specifically the collective action provision of the FLSA, 29 U.S.C. § 216(b), to remedy Defendant New Start's violations of the wage and hour provisions of the FLSA, as such violations have deprived Plaintiffs and others similarly situated of their lawfully-earned wages.

11.     Plaintiffs also bring this action on behalf of themselves and a class of similarly situated current and former employees of the Defendant New Start, pursuant to Fed. R. Civ. P. 23, for violations of New York Labor Law ("NYLL") § 195 and 12 N.Y. Comp. Codes R. & Regs. ("NYCRR") § 146-2.2 and 2.3.

12.     Plaintiffs also assert individual claims herein.

13.     From the outset of her employment, Plaintiff Lambert was subjected to quid pro quo sexual harassment, which directly interfered with her work performance and created a hostile and offensive work environment.  Defendant Stein consistently made lewd remarks about Plaintiff Lambert's appearance during the workday, leered at her in front of her coworkers, made repeated sexual advances during work hours, took Plaintiff Lambert to a strip bar, and asked her multiple times to go back to the strip bar with him.  Stein referred to himself as "Sugar Daddy" and "Baby Daddy" in his text messages to her and offered her grossly inappropriate gifts including a mani/pedi and "$100 for a little laser to the Cooch and maybe ass area…"

14.     Stein plainly implied that his leads were contingent on Plaintiff Lambert's participation in his sexual advances.  Plaintiff Lambert feared rejecting Stein as she was a young female living in New York, and she was reliant on Defendant Stein's leads in order to keep her job.

15.    Although Plaintiff Lambert made multiple complaints about Defendant Stein's persistent harassment to various persons/employees on numerous occasions, this unlawful conduct continued persistently throughout Plaintiff Lambert's employment.  In response, Defendants did not engage in remedial action, and ultimately retaliated against Plaintiff Lambert by denying her profitable leads, which resulted in a severe financial hardship to Lambert.

16.    Plaintiff Wiltz also suffered from discrimination and harassment during her brief employment with Defendants.  Specifically, Plaintiff Wiltz was terminated unlawfully when she disclosed a disability and requested the accommodation of working from home based on her disability.  In response, Defendants ignored her request for an accommodation.  Worse still, Defendants subjected Plaintiff Wiltz to disparate treatment based on race when she was denied the ability to work from home, although white employees were routinely permitted to work from home. Plaintiff Wiltz's subsequent termination was baseless, retaliatory, and unlawful.

## JURISDICTION AND VENUE

17.    This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this case is brought under the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* ("FLSA").

18.    This Court has supplemental jurisdiction over the New York state law claims, as they are so related to the claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

19.    Venue is proper in this District because Defendants conduct business in this District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

## DEMAND FOR JURY TRIAL

20.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs

demand trial by jury on all issues so triable as of right by jury.

## THE PARTIES

21.    Plaintiff Alana Lambert is an individual who resides in the County of Hudson, in

the State of New Jersey, and who worked for Defendants in the role of Sales Representative, from

December 5, 2022 through the present.

22.    Plaintiff Kimarah LeRouge is an individual who resides in the County of New

York, in the State of New York, and who worked for Defendants in the role of Sales

Representative, from December 5, 2022 through on or about July 2023.

23.    Plaintiff Erica Wiltz is an individual who resides in the State of New Orleans, and

who worked for Defendants in the role of Sales Representative (in a training capacity), from

October 30, 2023 through on or about November 2023.

24.    At all relevant times, Plaintiffs were "employees" of Defendants within the

meaning of all applicable statutes.

***The Corporate Defendant***

25.    Upon information and belief, NEW START CAPITAL, LLC F/K/A TITAN

CONSULTING GROUP LLC is a limited liability company organized and existing under the laws

of the State of New York and is authorized to do business in the State of New York, with a

headquarters and principal place of business located at 463 Seventh Avenue, 9th Floor, New York,

New York 10018.

26.     New Start was formerly known as TITAN CONSULTING GROUP, LLC but assumed the name of New Start on or about 2021. At the time that it was operating, TITAN CONSULTING GROUP, LLC was authorized to do business in the State of New York, with a headquarters and principal place of business located at 463 Seventh Avenue, 9th Floor, New York, NY 10018.

27.     At all relevant times, New Start was an "employer" within the meaning of all applicable statutes, and an enterprise engages in commerce as defined by FLSA §§ 203(r) and (s), with annual gross volume business in an amount not less than $500,000.

28.     At all relevant times, Defendant New Start was Plaintiffs' "employer" within the meaning of all applicable statutes.

***Defendant Robert Russini***

29.     Defendant Robert Russini ("Russini") is an individual who, upon information and belief is a citizen of the State of New York.

30.     At all relevant times, Russini held the position of Chief Operating Officer at New Start Capital.

31.     At all relevant times, Russini controlled the operations of New Start and determined the policies and practices of New Start, including, but not limited to, hiring and firing practices, sexual harassment training and compliance, how employees are compensated.

32.     Upon information and belief, at all relevant times, Defendant Russini had the authority to hire and fire Plaintiffs, determine the rate and method of payment for Plaintiffs, maintain Plaintiffs' employment records, and oversee New Start's sexual harassment training and compliance.

33.     At all relevant times, Defendant Russini was Plaintiffs' "employer" within the meaning of all applicable statutes.

### Defendant Dani Adelstein

34.     Defendant Dani Adelstein ("Adelstein"), is an individual who, upon information and belief is a citizen of the State of New York.

35.     At all relevant times, Adelstein held the position of Vice President of Sales at New Start.

36.     At all relevant times, Adelstein controlled the operations of New Start and determined the policies and practices of New Start, including, but not limited to, hiring and firing practices, sexual harassment training and compliance, how employees are compensated.

37.     Upon information and belief, at all relevant times, Defendant Adelstein had the authority to hire and fire Plaintiffs, determine the rate and method of payment for Plaintiffs, maintain Plaintiffs' employment records, and oversee New Start's sexual harassment training and compliance.

38.     At all relevant times, Defendant Adelstein was Plaintiffs' "employer" within the meaning of all applicable statutes.

### Defendant Phil Stein

39.     Defendant Phil Stein ("Stein") is an individual who, upon information and belief, is a citizen of the State of New York and resides in the County of Richmond.

40.     At all relevant times, Stein held the position of Senior Manager of Financial Consulting at New Start Capital.

41.     Mr. Stein was the direct supervisor of Plaintiff Lambert.

42.     Upon information and belief, at all relevant times, Defendant Stein had the authority to hire and fire Plaintiffs, supervise and set Plaintiffs' schedule, determine the rate and method of payment for Plaintiffs, maintain Plaintiffs' employment records, and assign work responsibilities to Plaintiffs.

43.     At all relevant times, Defendant Stein was Plaintiffs' "employer" within the meaning of all applicable statutes.

## INDIVIDUAL FACTUAL ALLEGATIONS

### Alana Lambert

44.     On or about December 5, 2022, Plaintiff Alana Lambert was hired by Defendant New Start to work as a Sales Representative, a role she holds through the current date.[1]

45.     Plaintiff Lambert identifies as a Black Female.

46.     Lambert's direct supervisors were Defendant Stein and Defendant Adelstein.

47.     Both of Plaintiff Lambert's direct supervisors are White Males.

48.     Plaintiff Lambert's duties included, inter alia: following up on leads from callers to enroll debtors into Defendant New Start's debt settlement program.  Once the debtor agreed to be enrolled in Defendants' loan program, the process would be handled by Defendants' legal team.

49.     Importantly, Defendant New Start did not distribute its leads blindly. Rather, the leads were initially distributed by the manager, Defendant Stein, until on or about August 2024, whereby he would provide profitable leads to employees he favored.  Thereafter, the leads were distributed by Paris Stamos, the assistant manager.

---

[1] In or about October 2023, Plaintiff Lambert was offered an Assistant Manager position but was later denied it in January 2024 after she reported discriminatory comments.

50.     Plaintiff Lambert worked out of Defendant New Start's main office, located at 463 7th Ave 9th floor, New York, NY 10018.

51.     Plaintiff Lambert typically worked six (6) days per week during the following hours: Monday through Friday, from 8:00 a.m. through 9:00 p.m.; Saturdays, from 11:00 a.m. to 3:00 p.m.; and occasionally, on Sundays from 10:00 a.m. to 3:00 p.m. for a total of approximately seventy (70) hours per week.

52.     Specifically, during the week of March 2023 Plaintiff Lambert recalls working at least seventy hours as she was trying to reach a specific goal, due to a contest called "March Madness." Likewise, during the week of October 28, 2028, Plaintiff Lambert worked at least seventy hours as she was attempting to reach a sales goal before Christmas.

53.     Plaintiff Lambert was not and is not an exempt employee, as evidenced by Defendant New Start's offer letter to her whereby it stated that her hourly rate would be $15.00, and her overtime rate would be $22.50 per hour for all hours over 40 in a workweek. (See Exhibit A, Lambert Offer Letter).

54.     Defendant New Start also gave Plaintiff Lambert a commission agreement which provided that commissions would be earned based on the amount of debt clients successfully enrolled into a debt settlement program, based on a specific formula, "less any wages advanced to you by the Company either on a salary or hourly basis as set forth in your offer letter." Thus, by its terms, the Commission Agreement provided that it would incorporate the terms of Ms. Lambert's Offer Letter, wherein her hourly rate was $15.00, and her overtime rate was $22.50.

55.     However, ultimately, Defendant New Start's compensation was not in accordance with Plaintiff Lambert's offer letter or Commission Agreement, as she was paid for only forty hours

a week, irrespective of how many hours she *actually* worked each week.  Defendant New Start did

not record Plaintiff's overtime hours, and did not pay her for approximately thirty overtime hours

each week.

56.     While Defendant New Start gave Plaintiff Lambert a second paycheck representing

commissions based on sales generated, that check was not compensation for overtime hours worked

(as Defendants never recorded or computed Plaintiff Lambert's overtime hours); therefore, the

commission check does not satisfy Defendants' obligations to pay overtime wages.

57.     Defendants demanded that Lambert work overtime hours but flagrantly failed to

record Plaintiff Lambert's overtime hours. <u>See e.g</u>., Exhibit C, Text Messages 9/29/23 ("Stein: …

We crush everyday!!! Take as many leads as you can. Late nights. Saturday's etc. plus every lead

I can get my hands on."); Text message 10/19/23 ("Stein: Don't forget kid. Ask Dani for late nights

and Saturday leads before 9am tomorrow morning if you remember.").

58.     In sum, Defendants paid Plaintiff Lambert wages for hours up to forty in a

workweek, plus monthly commissions, but made no payments at either the minimum wage rate or

overtime rate for any hours worked over forty whatsoever.

59.     Defendant New Start's failure to pay overtime wages was not limited to Plaintiff

Lambert alone.  Rather, this was Defendant New Start's pattern and practice and applied to all

employees working at the time.

60.     Defendants further breached their Commission Agreement by failing to pay

Plaintiff Lambert all the commission she was entitled to in each pay period as per the terms of the

contract.  As per the terms of the Commission Agreement, if an employee "sign[s] a clients [sic]

with $100,000 in debt and such clients successfully make two fee payments to the Company,"

employees would be paid commissions "during the month after it is earned with 50% of the commission to be paid in the first pay period of the following month and 50% to be paid in the second pay period of the following month". However, Defendants routinely failed to provide Plaintiff Lambert with timely commission payments, and frequently omitted applicable clients from the commission payment.

61.    Additionally, throughout the duration of her employment, Defendant New Start failed to provide Plaintiff Lambert with the required written wage notice upon hiring, in violation of NYLL § 195(1). To the extent any such notice was provided, it was inaccurate and misleading, since it did not accurately establish Plaintiff's pay structure.

62.    Likewise, Defendant New Start failed to provide Plaintiff Lambert with the required wage statements, setting forth specific criteria with each payment, in violation of NYLL § 195(3). To the extent same were provided to Plaintiff Lambert, they were inaccurate and misleading, since they did not include the *actual* number of hours worked, including the number of overtime hours worked, and pay for overtime hours.

63.    Defendants' failure to provide Plaintiff Lambert with a compliant notice of her pay rate upon hiring, and accurate pay stubs with each payment throughout her employment, in violation of NYLL § 195(1) and NYLL § 195(3), effectively concealed from Plaintiff Lambert, or interfered with Plaintiff's ability to identify and assess the wage violations that were, and remain, ongoing. Plaintiff's resulting lack of information complicated, or impeded, Plaintiff Lambert's efforts to remedy those violations. Because of the resulting underpayment of wages, Plaintiff Lambert was deprived of the opportunity to spend her wages on necessary expenses, including household

12

expenses, food, housing, utilities, and other items; to save her wages in interest-bearing accounts; or to otherwise invest her wages in other ways that could generate additional earnings.

64.    Plaintiff Lambert has been designated as a class representative for the FLSA Collective Action and the NYLL Class.  Plaintiff Lambert is ready, willing and able to accept the responsibilities of being a class representative.

***Plaintiff Lambert is Subject to Quid Pro Quo Sexual Harassment***

65.    Shortly after commencing her employment at New Start, Plaintiff Lambert was forced to endure blatant, open and egregious acts of sexual harassment in the workplace.

66.    Specifically, from the very beginning, Defendant Stein acted extremely inappropriately towards Plaintiff Lambert, making crude sexual comments during the workday, sending salacious text messages, giving her inappropriate gifts, and making sexual advances. Some of the gifts included wine as a housewarming gift, mani/pedis, and Pilates classes. Defendant Stein also wrote to Plaintiff Lambert that: "Of all the things I can cash app and help my Bestie with, $100 for a little laser to the Cooch and maybe ass area would definitely be one of them. Obviously, I would need to make sure they did a good job!!!! As best friends do!!! Lmaoo." (Exhibit D, Stein Instagram Messages April 2024).

67.    Defendant Stein referred to himself repeatedly as her "Sugar Daddy" or "Baby Daddy."

68.    On or about September 2023, Defendant Stein took Plaintiff Lambert to a strip bar and paid for Plaintiff Lambert to have a lap dance with a stripper called Blue, which escalated to Blue giving oral sex to Plaintiff Lambert while Stein watched. Thereafter Defendant Stein made repeated references to seeing Blue again with Plaintiff Lambert. On January 4, 2024, Stein wrote

to Plaintiff Lambert: "Obviously our Blue night was great, and we need another one…" (Exhibit D, Stein Instagram Messages, Jan. 4, April 2024). On April 30, 2024, Stein wrote, "We need a day soon for blue to do her thing with us at a NYC hotel. Dark side!!!" (Id.). See also Exhibit C, Text Message 10/23/23 (Stein: "Do you need some cash for a mani/pedi? Cause if you and I are going to be walking around NYC together, potentially going to the gym together, hanging out with Blue or her friends together…. You have to come correct Lambert!!!"); Text Message 10/27/23 (Stein: "I should say… with enough Hennessy and Jameson shots, with you and Blue…. Nothing is out of the question!!!! Lmaoooo").

69.    Defendant Stein frequently asked to see naked or sexy pictures of Plaintiff Lambert. In January 2024, he wrote, "Speaking of personal ass sex pics that you don't send me. Have you tried the camera yet? Did it get shit on?" (Exhibit D, Stein Instagram Messages, January 2024). Soon afterward, Defendant Stein sent Plaintiff Lambert a picture of himself in boxers and noted, "Real ass pics between friends are taken in sexy underwear." (Id., Stein Instagram Messages, January 28, 2024).

70.    Stein's inappropriate text messages and Instagram messages included the following:

> September 1, 2023: "Hey Lambert. Obviously you're my favorite and I wanna make sure you make a ton of money. We fool around on text and what we joke about but if you ever have an issue with anything or me pointing out that you or your outfit is unbelievably sexy. Let me know. Either way I'll still be your sugar daddy lawyer."
>
> October 26, 2023: "Stein: … Great job kid!!! Keep up the great work!!! You're the best!!! You're hair and skin is on point today!!!"
>
> Feb. 4, 2024: "Stein: Lana Cole, my dear…if I was someone that even contributed a little bit, I would have no problem showering her with little gifts like a sick car!!! Sexy Pass Pick would help. lol."

March 7, 2024: "Stein: At least you know I won't be a broke baby daddy!!! Only the best for my girls!!! Lolol"

April 21, 2024: Stein (about picture of abs):

> "Who is this?!?! Cause if it's you, I want partial credit. I have the hottest bestie! Period!"

> […]

> "I want a black let us see your buns t shirt. Make that happen!!! Good night kid!!!"

April 26, 2024: "Stein: Pink Porche. Posting about Sugar Daddies at the airport. Say the word and we'll step our bestie relationship up a notch."

May 20, 2024: "Stein: I really don't need Jamele knowing that I bought you nice gifts. Especially the watch. That's all I'm saying."

(See Exs. C and D, Assorted Text and Instagram Messages from Stein to Lambert).

71.     Plaintiff Lambert was appalled by Stein's conduct, but tried the best she could to

ignore his behavior for the sake of her job, which she desperately needed.

72.     Since Stein distributes the leads, Plaintiff Lambert realized it was imperative to stay

on his good side.  In fact, Stein made many repeated references to the leads in his inappropriate

text messages:

> July 17, 2023: "Stein: …I told them not to fuck around and give you some real leads. Check your queue. There's new leads plus my leads I gave you marked New."

> July 24, 2023: "You know what. Last year I barely knew you and you got a Dunkin gift card. Keep putting up debt and you may get this." Picture of watch (which he gave Plaintiff Lambert the following year).

> August 11, 2023: "Stein: Hey bruh. I'm sure you're aware I spread around my leads and credit pulls, etc to everyone. Obviously, my favorite person gets the most and best. Try not to let vasic, or anyone else for that matter, know how many you get. Pretty please."

(See Exhibit C, Assorted Text Messages from Stein to Lambert). See also Exhibit D, Stein Instagram Messages 6/3/24 ("Yo as long as you work and I'm giving out leads, you're gonna put up debt everyday!!!!"); Stein Instagram Messages 6/8/24 ("Stein: You got the best ones….And keep the quality quiet please. If bigger ones come I'll send. And please cal[] them. Thanks. lol.").

73. Defendant Adelstein also made inappropriate sexual remarks to Plaintiff Lambert. Adelstein asked her to twirl at a company dinner, called her a "smoke show" in public speeches, and told Plaintiff Lambert that he had raunchy dreams about her. Defendant Adelstein also told the male representative that Plaintiff Lambert was a "hot" model.

74. Defendant Adelstein, like Defendant Stein, frequently reminded Plaintiff Lambert that he had the power and ability to give her profitable leads.

***After an Employee Complains about Defendants' Sexual Harassment, Defendants Conduct a Sham Investigation, and Fail to Engage Remedial Action***

75. In or about May 2024, employee Naya Abouzaid reported Defendant Stein's sexual harassment to New Start. Shockingly, in retaliation for making the complaint, Naya Abouzaid was terminated on or about May 21, 2024, for pretextual reasons.

76. Thereafter, New Start commenced a sham investigation which, shockingly, did not reveal any of Defendant Stein's grossly inappropriate text and Instagram messages as Defendant Stein conveniently deleted them and New Start did nothing to retrieve them

77. On or about June 2024, Defendant Russini questioned Plaintiff Lambert about Defendant Stein's sexual harassment as part of its sham investigation. Plaintiff Lambert relayed to Defendant Russini how Defendant Stein's salacious text messages and sexual advances made her extremely uncomfortable but she had no alternative but to be subjected to this conduct since she was reliant on Defendant Stein's influence in the company and his leads.

16

78.    In response, Defendant New Start did not engage in a meaningful investigation, and no corrective action was taken.  Defendant Stein was merely "written up" for sexual misconduct in or about July 2024, but it was just a token response with no real consequences; thus, Defendant Stein continued his grossly improper conduct.  He continued to make vulgar comments and suggestions towards Plaintiff Lambert in person and via text messages.

79.    Shockingly, despite the egregious nature of Stein's sexual harassment, New Start acted with deliberate indifference.

80.    Defendant Russini, the CEO, who knew or should have known of Defendant Stein's gross misconduct during work hours, did nothing.  Defendant Russini did not discipline Stein, and worse still, he failed to do anything to prevent Defendant Stein from engaging in similar misconduct in the future.

81.    Defendant Adelstein, who knew or should have known of Defendant Stein's gross misconduct during work hours, also did nothing.  He did not discipline Defendant Stein, and worse still, he failed to do anything to prevent Defendant Stein from engaging in similar misconduct in the future.  Thus, Defendant Stein has continued to engage in sexual harassment.

82.    Based on Defendants' apathetic response, Defendant Stein believed he could get away with his indecent and unlawful behavior.

*Plaintiff Lambert is Subject to Unlawful Retaliation*

83.    However, there was a material change in the quality of leads to Plaintiff Lambert. Since she complained to Defendant New Start on or about June 2024, she began receiving leads that had very little value, thus lowering her commissions significantly.  Then, in August 2024, Defendants' leads to Plaintiff Lambert became significantly worse.  The change in the quality of

17

the leads from Defendant New Start was not a coincidence; rather, it was direct retaliation for Plaintiff Lambert complaining about sexual harassment.

**Plaintiff Kimarah LeRouge**

84.    On or about December 5, 2022, Plaintiff LeRouge was hired by Defendant New Start to work as a Sales Representative, and she held this role until July 2023.

85.    Plaintiff LeRouge identifies as a Black Female.

86.    Plaintiff LeRouge's direct supervisors were Defendant Adelstein and Paris Stamos, the assistant manager.

87.    Plaintiff LeRouge's duties included, <u>inter alia</u>: following up on leads from callers to enroll debtors into Defendant New Start's debt settlement program.  Once the debtor agreed to be enrolled in Defendants' loan program, the process would be handled by Defendants' legal team.

88.    Plaintiff LeRouge worked out of Defendant New Start's main office, located at 463 7th Ave 9th floor, New York, NY 10018.

89.    Plaintiff LeRouge typically worked six (6) days per week during the following hours: Monday through Friday, from 11:00 a.m. through 8:00 or 9:00 p.m.; and on Saturday, from 10:00 a.m. to 3:00 p.m. for a total of approximately fifty (50) hours per week.

90.    Specifically, during the weeks of March 13, 2024, and March 27, 2024 Plaintiff LeRouge recalls working more than fifty hours each week, as she was trying reach a goal in connection with Defendants' March Madness contest.

91.    Plaintiff LeRouge was not and is not an exempt employee, as evidenced by Defendant New Start's offer letter to her whereby it stated that her hourly rate would be $15.00,

and her overtime rate would be $22.50 per hour for all hours over 40 in a workweek. (See Exhibit B, LeRouge Offer Letter).

92.    Defendant New Start also gave Plaintiff LeRouge a commission agreement which provided that commissions would be earned based on the amount of debt of clients successfully enrolled into a debt settlement program, based on a specific formula, "less any wages advanced to you by the Company either on a salary or hourly basis as set forth in your offer letter." Thus, by its terms, the Commission Agreement provided that it would incorporate the terms of Ms. LeRouge's Offer Letter, wherein her hourly rate was $15.00, and her overtime rate was $22.50.

93.    However, ultimately, Defendant New Start's compensation was not in accordance with Plaintiff LeRouge's offer letter or Commission Agreement, as she was paid for only forty hours a week, irrespective of how many hours she *actually* worked each week.  Defendant New Start did not record Plaintiff LeRouge's overtime hours, and did not pay her for approximately ten overtime hours each week.

94.    While Defendant New Start gave Plaintiff LeRouge a second paycheck representing commissions based on sales generated, that check was not compensation for overtime hours worked (as Defendants never recorded or computed Plaintiff LeRouge's overtime hours); therefore, the commission check does not satisfy Defendants' obligations to pay overtime wages.

95.    In fact, Defendant New Start flagrantly failed to record Plaintiff LeRouge's overtime hours and joked about the fact that its employees never clocked in.

96.    Defendant New Start's failure to pay overtime wages was not limited to Plaintiff LeRouge alone.  Rather, this was Defendant New Start's pattern and practice and applied to all employees working at the time.

19

97.    Defendants further breached their Commission Agreement by failing to pay Plaintiff LeRouge all the commission she was entitled to in each pay period as per the terms of the contract, although she was relying on Defendants' express representations that they would pay commissions for all applicable clients during the designated pay period.

98.    Additionally, throughout the duration of her employment, Defendant New Start failed to provide Plaintiff LeRouge with the required written wage notice upon hiring, in violation of NYLL § 195(1).  To the extent any such notice was provided, it was inaccurate and misleading, since it did not accurately establish Plaintiff LeRouge's pay structure.

99.    Likewise, Defendant New Start failed to provide Plaintiff LeRouge with the required wage statements, setting forth specific criteria with each payment, in violation of NYLL § 195(3).  To the extent same were provided to Plaintiff LeRouge, they were inaccurate and misleading, since they did not include the *actual* number of hours worked, including the number of overtime hours worked, and pay for overtime hours.

100.    Defendants' failure to provide Plaintiff LeRouge with a compliant notice of her pay rate upon hiring, and accurate pay stubs with each payment throughout her employment, in violation of NYLL § 195(1) and NYLL § 195(3), effectively concealed from Plaintiff LeRouge, or interfered with Plaintiff's ability to identify and assess the wage violations that were, and remain, ongoing. Plaintiff's resulting lack of information complicated, or impeded, Plaintiff LeRouge's efforts to remedy those violations.  Because of the resulting underpayment of wages, Plaintiff LeRouge was deprived of the opportunity to spend her wages on necessary expenses, including household expenses, food, housing, utilities, and other items; to save her wages in interest-bearing accounts; or to otherwise invest her wages in other ways that could generate additional earnings.

20

101.    Upon hiring Plaintiff LeRouge, Defendants failed to conduct the mandatory sexual harassment training.

102.    Plaintiff LeRouge has been designated as a class representative for the FLSA Collective Action and the NYLL Class.  Plaintiff LeRouge is ready, willing and able to accept the responsibilities of being a class representative.

**Plaintiff Erica Wiltz**

103.    On or about October 30, 2023, Plaintiff Wiltz was hired by Defendant New Start to work as a Sales Representative.

104.    Plaintiff Wiltz held this role until November 2023, when she was unlawfully terminated due to Defendant New Start's systemic racial discrimination and hostile work environment based on race.

105.    Plaintiff Wiltz identifies as a Black Female.

106.    Plaintiff Wiltz's direct supervisors were Defendant Stein and Defendant Adelstein.

107.    Both of Plaintiff Wiltz's direct supervisors are White Males.

108.    Upon hiring Plaintiff Wiltz, Defendants failed to conduct the mandatory sexual harassment training.

109.    Plaintiff Wiltz's duties included, inter alia: following up on leads from callers to enroll debtors into Defendant New Start's debt settlement program.  Once the debtor agreed to be enrolled in Defendants' loan program, the process would be handled by Defendants' legal team. Plaintiff Wiltz started off in a training capacity.

110.    Initially, Defendant New Start had promised Plaintiff Wiltz that she would be able to work remotely after three months, and she started her employment with Defendants based on that material representation.

111.    On or about late November 27, 2023, Plaintiff Wiltz asked Defendant Adelstein for permission to work remotely before the completion of three months' work due to her disability.

112.    Specifically, Plaintiff Wiltz disclosed that she suffers from post-surgical scoliosis with chronic pain and spinal degenerative issues, as she previously had spinal fusion. Additionally, Plaintiff Wiltz suffers from chronic pain related to bulging discs, osteoarthritis, and spinal stenosis.

113.    Plaintiff Lambert had also notified Defendant Stein that Plaintiff Wiltz suffers from a disability.

114.    Plaintiff Wiltz requested the reasonable accommodation of working from home, because she saw that many of Defendants' employees worked remotely and therefore it was plainly an option.

115.    Defendant Adelstein initially agreed to Plaintiff Wiltz's request to work from home, before the passage of three months.

116.    However, the following day, November 28, 2023, Defendant Adelstein pulled Plaintiff Wiltz aside and explained that the owner of New Start had decided to deny Plaintiff Wiltz the option of working remotely, at any time – not at this juncture and not at the completion of three months' work. Defendant Adelstein explained that "we have had problems with people like you in the past," as another Black female employee, who had been granted the option of remote working, had abused the privilege. Thus, Defendant New Start engaged in rank racial profiling

and baselessly determined that Plaintiff Wiltz, also a Black female, would similarly abuse the privilege of working remotely.

117. Plaintiff Wiltz objected to the disparate treatment and reminded Defendant Adelstein that Defendant New Start had represented that she would be permitted to work remotely. Plaintiff Wiltz reminded Defendant Adelstein that her request to work from home was linked to her disability as the commute alone – specifically, standing for long periods on the train – caused her a great deal of pain. Likewise, at home, Plaintiff Wiltz had the ability of changing positions frequently during the day to alleviate the pain in her back.

118. In response, Defendant Adelstein did not engage in an interactive process.

119. Instead, Defendant Adelstein directed Plaintiff Wiltz to write a resignation letter and dictated it to her word for word. The resignation letter was effectively an unlawful termination as Plaintiff Wiltz wished to continue working for Defendant New Start in conformity with the terms promised to her. However, Defendant Adelstein directed Plaintiff to write a purported "resignation letter."

120. Defendant New Start's treatment of Plaintiff Wiltz gives rise to an inference of racial discrimination as it routinely allows its non-minority workers to work remotely. Nonetheless, it refused to allow Plaintiff Wiltz to work remotely, since it compared her to another Black employee who had abused the privilege of working from home.

121. Later, Defendant Adelstein confessed that Plaintiff Wiltz had been hired as "eye candy." Defendant Adelstein made this confession to a group of men, including manager, Defendant Stein.

122.    Plaintiff Wiltz's termination was not an isolated event. In 2023 alone, approximately 15 Black women, 1 Latina woman, and 1 white man were terminated. Thus, the disparity between the treatment of white employees versus non-white employees at New Start cannot be overstated.

## **FLSA COLLECTIVE ACTION ALLEGATIONS**

123.    Plaintiffs Lambert and LeRouge bring this action pursuant to 29 U.S.C. § 216(b) on their own behalf, as well as those in the following class:

> Current and former employees of Defendant New Start, during the relevant statutory period, who were denied the statutory minimum wage, and overtime compensation at the statutory rate of one-and-one-half times their regular hourly rate which is legally due to them, for the time worked in excess of forty (40) hours per week ("FLSA Plaintiffs").

124.    At all relevant times, Plaintiffs Lambert and Lerouge and the members of the FLSA Plaintiffs are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subject to Defendant New Start's decision, plan and common policies, programs, practices, procedures, protocols, routines, and rules of willfully failing and refusing to pay them one-and-one half times their hourly rate of pay, for work in excess of forty (40) hours per workweek. The claims of Plaintiffs herein are essentially the same as those of the other FLSA Plaintiffs.

125.    This case is properly brought under and maintained as an opt-in collective action pursuant to § 16(b) of the FLSA, 29 U.S.C. § 216(b). The FLSA Plaintiffs are readily ascertainable. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendant New Start.

## CLASS ACTION ALLEGATIONS

126.     Plaintiffs Lambert and LeRouge bring their claims under the NYLL pursuant to the Federal Rules of Civil Procedure ("F.R.C.P.") Rule 23 on behalf of all the following class:

> Current and former employees of Defendant New Start who performed any work for Defendants New Start during the statutory period, within the State of New York, and who:
>
> > (1) worked in excess of forty hours per week without receiving compensation for those hours at the statutory minimum wage;
> >
> > (2) worked in excess of forty hours per week without receiving overtime compensation at the mandatory statutory rate;
> >
> > (3) were given Commission Agreements in connection with their hiring;
> >
> > (4) were not issued accurate and/or complete pay stubs/wage statements on each payday containing the information required by N.Y. Lab. Law § 195(3); and/or
> >
> > (5) were not issued accurate and/or complete pay notices upon hiring and annually thereafter, containing the information required by N.Y. Lab. Law § 195(1); ("Class Action Plaintiffs").

127.     *Numerosity:* The members of the Rule 23 Class are so numerous that joinder of all members in the case would be impracticable.  Plaintiffs reasonably estimate there are at least 50 Class Members who reside and work in New York.  The precise number of Class Members should be readily available from a review of Defendant New Start's personnel and payroll records.

128.     *Commonality/Predominance:* There is a well-defined community of interest among the Rule 23 Class Members and common questions of *both* law and fact predominate in the action over any questions affecting individual members.  These common legal and factual questions include, but are not limited to, the following:

> a)  Whether Defendant New Start required each Class Action Plaintiff to work in

25

excess of forty hours per week.

b) Whether Defendant New Start compensated the Class Action Plaintiffs at the legally-mandated minimum wage rate for hours worked per week over forty.

c) Whether Defendant New Start compensated the Class Action Plaintiffs at the legally-mandated rate of one-and-one-half times their respective straight time rates of pay for hours worked per week over forty.

d) Whether Defendants breached their Commission Agreements with Plaintiffs and Class Members.

e) Whether Defendants made false and misleading representations as to the nature and timing of compensation provided to Plaintiffs and Class Members.

f) Whether Defendants fraudulently induced Plaintiffs and Class Members to enter into their employ by affirmatively misrepresenting the quantity the nature and timing of its commission payments to them.

g) Whether Defendants misrepresented and/or omitted material information relating to commission payments it would provide to Plaintiffs and Class Members.

h) Whether Defendant New Start furnished the Class Action Plaintiffs with accurate wage statements on each payday containing the information required by N.Y. Lab. Law § 195(3).

i) Whether Defendant New Start furnished the Class Action Plaintiffs with accurate wage notices upon hiring, and annually thereafter, containing the information required by N.Y. Lab. Law § 195(1).

j) Whether Defendant New Start maintains any affirmative defenses with respect to

the Class Action Plaintiffs' claims; and

k)   Whether Defendant New Start's actions with respect to the Class Action Plaintiffs were in violation of the NYLL and supporting regulations.

129.   *Typicality:* Plaintiffs' claims are typical of those of the Rule 23 Class in that the Plaintiffs and all other members suffered damages as a direct and proximate result of Defendant New Start's common and systemic payroll policies and practices.  Plaintiffs' claims arise from the same policies, practices, and course of conduct as all other Rule 23 Class Members' claims and Plaintiffs' legal theories are based on the same legal theories as all other Rule 23 Class Members, as detailed above.

130.   *Adequacy:* Plaintiffs Lambert and LeRouge will fully and adequately protect the interests of the Rule 23 Class.  Furthermore, Class Counsel, Bell Law Group, PLLC are highly qualified to litigate Plaintiffs' and the Class's claims.

131.   *Superiority:* A class action is superior to other available methods for the fair and efficient adjudication of the controversy because, inter alia, it is economically unfeasible for the Rule 23 Class Members to prosecute individual actions of their own given the relatively small amount of damages at stake for each individual, along with the fear of reprisal by their employer. Notably:

a)   This case involves a corporate Defendant, that has vast resources, and many individual proposed Class members who have limited resources and who have relatively small claims with common questions of law and fact;

b)   If each individual was required to file a separate lawsuit, Defendant New Start, with its vast resources, would be able to exploit and overwhelm the limited

resources of the proposed Class members;

c)  Requiring each individual to file a separate lawsuit will discourage members of the potential Class still employed by Defendant New Start from asserting lawful claims because of an appreciable fear that Defendant New Start will retaliate against them;

d)  Prosecuting separate lawsuits by each member of the proposed Class will create a substantial risk of inconsistent or varying verdicts; will establish potentially incompatible standards of conduct for Defendant New Start; will result in legal determinations as to each individual that are dispositive of the interest of the other proposed Class members who are not parties to the adjudications; and will impair or impede the ability of the proposed Class members to protect their own interests;

e)  The individual claims are not large enough to warrant the costs and expenses that will be incurred in individual prosecution making it difficult, if not impossible, for the individuals to redress the wrongs done to them; and

f)  The cost to the legal system for individual adjudication will be substantial making the class action superior.

132.   The case will be manageable as a class action because Defendant New Start should have payroll systems that will allow the wage-and-hour damages issues in the case to be resolved with relative ease.  Because the elements of Rule 23(b)(3), or in the alternative (c)(4), are satisfied in the case, class certification is appropriate.

133.   Defendant New Start has acted on grounds generally applicable to the Class, thereby making relief, including declaratory and/or injunctive relief, appropriate for the Class.

### FIRST CAUSE OF ACTION AGAINST DEFENDANTS
#### (Unpaid Minium and Overtime Wages under the FLSA, 29 U.S.C. § 207)

134.    Plaintiffs, the FLSA Plaintiffs, and the NYLL Class Action repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

135.    Defendants violated the rights of their employees, by failing to compensate them *at all* for any hours worked over forty in one week, thereby failing to properly compensate those employees at the statutory minimum wage, in violation of the FLSA, 29 U.S.C. § 206(a).

136.    Defendants further violated the rights of their employees, by failing to pay overtime compensation at a rate not less than one-and-one-half times their regular rate of pay for each hour worked in excess of 40 per week, in violation of the FLSA, 29 U.S.C. § 207(a)(l).

137.    For example, Defendants systematically failed to play Plaintiffs Lambert and LeRouge overtime compensation at the mandatory statutory rate for all hours over 40 in a workweek; rather, Plaintiffs were only paid for 40 hours each week irrespective of how many hours they actually worked.

138.    Defendants' failure to pay Plaintiffs Lambert and LeRouge and the FLSA Plaintiffs overtime compensation was willful within the meaning of the FLSA, 29 U.S.C. § 255.

139.    Therefore, the Defendants are liable to Plaintiffs and the FLSA Plaintiffs for their unpaid overtime compensation, plus an additional equal amount as liquidated damages, reasonable attorney's fees and costs, and any other appropriate relief pursuant to 29 U.S.C. § 216(b).

**SECOND CAUSE OF ACTION AGAINST DEFENDANTS**
**(Failure to Pay Minimum and Overtime Wages in Violation of NYLL § 650 *et seq.* and 12 N.Y.C.R.R. 142-2.1 *et. seq.*)**

140.    Plaintiffs, FLSA Plaintiffs, and the NYLL Class Action repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

141.    Under New York law, an employer shall compensate an employee for all hours worked at the statutory minimum wage. 12 N.Y.C.R.R. § 142-2.1.

142.    Further, an employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate of pay, or one-and-a-half times the applicable minimum wage. 12 N.Y.C.R.R. § 146-1.4.

143.    Throughout the period covered by the applicable statute of limitations, and upon information and belief, Defendants failed to pay Plaintiffs Lambert and LeRouge and the proposed Class members at the minimum wage rate and the overtime rate of at least one-and-a-half times the regular rate of pay, or one-and-a-half times the applicable minimum wage, for each hour worked in excess of 40 hours per week as required by the NYLL and accompanying regulations. Rather, Plaintiffs Lambert and LeRouge were only paid for 40 hours each week irrespective of how many hours they actually worked.

144.    Defendants willfully failed to pay Plaintiffs Lambert and LeRouge and the proposed Class members at either the minimum wage or the required overtime rate for all hours worked in excess of 40 hours per week.

145.    As a result of Defendants' willful and intentional unlawful conduct, Plaintiffs and the proposed Class members are entitled to damages in an amount to be determined at trial,

liquidated damages, attorneys' fees, costs, pre-judgment interest, post-judgment interest, all other damages available under New York law, and such other legal and equitable relief as this Court deems just and proper.

## THIRD CAUSE OF ACTION AGAINST DEFENDANTS
### (Failure to Provide Wage Notice in Violation of NYLL § 195(1))

146.    Plaintiffs, on behalf of themselves, the Class and other FLSA Plaintiffs, reallege and incorporate by reference all previous paragraphs as if set forth fully herein.

147.    New York law mandates that upon the hire of an employee, the employer must furnish an accurate notice to the employee containing the employee's rate of pay, the frequency of their pay, allowances claimed, the name of the employer, and "doing business as" names used by the employer, the physical address of the employer's main office or principal place of business, and a mailing address if different, and the telephone number of the employer, among other items. NYLL § 195(1)(a).

148.    Plaintiffs, the NYLL Class and FLSA Plaintiffs were not exempt from this requirement.

149.    Defendants failed to provide an accurate wage notice to Plaintiffs, the NYLL Class and FLSA Plaintiffs, resulting in injuries.

150.    The foregoing conduct of Defendants constitutes willful violations of the NYLL and/or its regulations.

151.    Plaintiffs seek, on behalf of themselves, the NYLL Class and FLSA Plaintiffs, and are entitled to maximum statutory damages under NYLL § 198(1-b) of $5,000 for Defendants' violations of NYLL § 195(1), in addition to interest, reasonable attorneys' fees, and costs of the action.

**FOURTH CAUSE OF ACTION AGAINST DEFENDANTS**
**(Failure to Provide Pay Statements in Violation of NYLL § 195(3))**

152.    Plaintiffs, on behalf of themselves, the Class and other FLSA Plaintiffs, reallege and incorporate by reference all previous paragraphs as if set forth fully herein.

153.    New York law mandates that employers furnish employees with a statement with every payment of wages. NYLL § 195(3).

154.    At all relevant times herein and continuing to present, Defendants failed to provide Plaintiffs, the NYLL Class and FLSA Plaintiffs with a written statement at the time wages were paid containing the dates of work covered by the payment of wages; name of employee; name of employer; address and phone number of employer; rate(s) of pay and basis this of; gross wages; deductions; allowances, if any; net wages; regular hourly rate of pay; overtime rate of pay; number of regular hours worked; and number of overtime hours worked.

155.    Plaintiffs, the NYLL Class and FLSA Plaintiffs were not exempt from this requirement.

156.    Defendants failed to provide such pay statements to Plaintiffs, the NYLL Class and FLSA Plaintiffs, resulting in injuries.

157.    The foregoing conduct of Defendants constitutes willful violations of the NYLL and/or its regulations.

158.    Plaintiffs seek on behalf of themselves, the Class and other FLSA Collective, and are each entitled to maximum statutory damages under NYLL § 198(1-d) of $5,000 for Defendants' violations of NYLL § 195(3), in addition to interest, reasonable attorneys' fees, and costs of the action.

## FIFTH CLAIM AGAINST DEFENDANTS
### (Fraudulent Inducement and Misrepresentation)

159.    Plaintiffs, on behalf of themselves, the Class and other FLSA Plaintiffs, reallege and incorporate by reference all previous paragraphs as if set forth fully herein.

160.    As alleged above, Defendants knowingly made material misrepresentations in the Offer Letter and Commission Agreement which they gave their employees upon hiring.

161.    Defendants made such material misrepresentations in order to induce Plaintiffs and Class members to enter into their employment.

162.    Plaintiffs and Class members relied upon Defendants' material misrepresentations to their detriment, and entered into an employment agreement with Defendants on the representation that, inter alia, when an employee would "sign[] a clients [sic] with $100,000 in debt and such clients successfully make two fee payments to the Company," employees would be paid commissions "during the month after it is earned with 50% of the commission to be paid in the first pay period of the following month and 50% to be paid in the second pay period of the following month".

163.    Defendants failed to provide commissions to Plaintiffs and Class Members on clients as promised, and also did not provide the commissions in the timeframe set forth in the Commission Agreement, to their detriment.

164.    As a result of all Defendants' fraudulent conduct, Plaintiffs and Class members suffered monetary damages and other losses.

## SIXTH CLAIM AGAINST DEFENDANTS
### (Breach of Contract)

165.    Plaintiffs, on behalf of themselves, the Class and other FLSA Plaintiffs, reallege and incorporate by reference all previous paragraphs as if set forth fully herein.

166.    Defendants provided Plaintiffs and Class Members with a contract and agreement regarding their commission payments.

167.    As per the terms of the Commission Agreement, when an employee would "sign[] a clients [sic] with $100,000 in debt and such clients successfully make two fee payments to the Company," then Defendants would pay commissions, "during the month after it is earned with 50% of the commission to be paid in the first pay period of the following month and 50% to be paid in the second pay period of the following month."

168.    However, Defendants materially breached this contract by omitting clients that fit the above criteria from the commission payment entirely. If Plaintiffs would insist on being paid commission payments for the missing clients, Defendants would provide them with the missing commissions much later than the timeline set forth in the contract.

169.    In addition to the express terms of the parties' agreement, the agreement was subject to an implied covenant of good faith and fair dealing.

170.    Defendants callously and in bad faith ignored their obligations to Plaintiffs and Class Members under their agreement by failing to pay them the commissions due and owing under that agreement, and by repeatedly ignoring their good faith complaints made to recoup their rightful wages.

171.    As a result of all Defendants' fraudulent conduct, Plaintiffs and Class members suffered monetary damages and other losses.

## SEVENTH CLAIM AGAINST DEFENDANTS
## BY PLAINTIFF LAMBERT

### (Quid Pro Quo Sexual Harassment under the NYCHRL and NYSHRL)

172.    Plaintiff Lambert repeats, reiterates and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

173.    The NYCHRL and NYSHRL prohibit discrimination in the terms, conditions, and privileges of employment on the basis of an individual's sex/gender.

174.    Defendants discriminated against Plaintiff Lambert in violation of the NYCHRL and NYSHRL by permitting a hostile work environment, in the form of continuous and pervasive sexual harassment.

175.    Frequently, during the work day, Defendant Stein made vulgar comments about Plaintiff Lambert's appearance, sent indecent text messages, stared lewdly at her body, and made repeated sexual advances.

176.    Quid pro quo sexual harassment occurs when employment, pay, benefits, title, position or other opportunities for advancement or training are conditioned on the submission to unwelcome sexual advances. Here, Plaintiff Lambert's supervisor, Defendant Stein, engaged continuously in quid pro quo sexual harassment by conditioning her leads on sexual bantering, sexual favors, and taking Plaintiff Lambert to a strip bar, among other things.

177.    Defendants knew or should have known about the ongoing sexual discrimination, but they failed entirely to prevent or correct the harassment and hostile work environment.

178.    In fact, another employee complained about the sexual harassment in May 2024, but Defendants did not engage in any remedial action.

179.    Likewise, Plaintiff Lambert complained about the sexual harassment in June 2024, and Defendants again failed to engage in any remedial action.

180.    As a result of Defendants' discriminatory acts, Plaintiff Lambert has suffered and will continue to suffer damages, including loss of past and future earnings and other employment benefits, and has suffered other damages for, inter alia, mental anguish, emotional distress, humiliation, and loss of reputation.

181.    Defendants' conduct was willful and motivated by malice and/or reckless indifference to Plaintiff Lambert's legal rights, entitling her to an award of punitive damages.

### EIGHTH CLAIM AGAINST DEFENDANTS
### BY PLAINTIFF WILTZ

**(Discrimination Based on Race/National Origin, under the NYCHRL and NYSHRL)**

182.    Plaintiff Wiltz repeats, reiterates and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

183.    The NYCHRL and NYSHRL prohibit discrimination in the terms, conditions, and privileges of employment on the basis of an individual's race/national origin.

184.    Defendants discriminated against Plaintiff Wiltz in violation of the NYCHRL and NYSHRL by permitting a hostile work environment, in the form of continuous and racial discrimination.

185.    Indeed, at New Start, minority employees were held to a more stringent standard of conduct, and were more likely to be terminated at the slightest infraction.  By way of example, in 2023 alone, approximately 15 Black women, 1 Latina woman, and 1 white man were terminated. Thus, the disparity between the treatment of white employees versus non-white employees at New Start cannot be overstated.

186. In this vein, Defendants engaged in disparate treatment by denying Plaintiff Wiltz the option of working from home, based on racial bias, while allowing its non-minority employees to work from home.

187. When Plaintiff Wiltz objected to the disparate treatment, she was forced to resign.

188. As a result of Defendants' discriminatory acts, Plaintiffs Wiltz has suffered and will continue to suffer damages, including loss of past and future earnings and other employment benefits, and has suffered other damages for, inter alia, mental anguish, emotional distress, humiliation, and loss of reputation.

189. Defendants' conduct was willful and motived by malice and/or reckless indifference to Plaintiff Wiltz's legal rights, entitling her to an award of punitive damages.

### NINTH CLAIM AGAINST DEFENDANTS
### BY PLAINTIFF WILTZ

**(Discrimination Based on Disability and Failure to Grant a Reasonable Accommodation under the NYCHRL and NYSHRL)**

190. Plaintiff Wiltz repeats, reiterates and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

191. It is unlawful to discriminate or retaliate against an employee who requests a reasonable accommodation due to a disability.

192. As set forth above, on or about November 27, 2023, Plaintiff Wiltz disclosed a disability and requested a reasonable accommodation of working from home due to her disability.

193. The next day, November 28, 2023, Defendants summarily denied Plaintiff Wiltz's request for a reasonable accommodation, without engaging in an interactive process.

194.     Worse still, upon denying Plaintiff Wiltz the reasonable accommodation of working from home, Defendant Adelstein directed Plaintiff Wiltz to write a letter of resignation, thus terminating her employment.

195.     As a result of Defendants' conduct, Plaintiff Wiltz has suffered the loss of employment including, wages, health insurance benefits, retirement and pension benefits.

196.     In addition, as a consequence of Defendants' conduct, Plaintiff Wiltz suffered an exacerbation of her disability as well as pain and suffering, mental anguish and humiliation.

197.     Accordingly, as a result of Defendants' unlawful conduct, Plaintiff Wiltz has been damaged as set forth herein, and is entitled to the maximum compensation available under this law.

### TENTH CLAIM AGAINST DEFENDANTS
### BY PLAINTIFFS LAMBERT AND WILTZ
**(Retaliation under the NYCHRL and NYSHRL)**

198.     Plaintiffs repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

199.     The NYCHRL prohibits retaliation by any person against any individual who in good faith complains about discriminatory practices to which he/she has been subjected. Specifically, the New York City Administrative Code title 8-107(7) provides that:

> "It shall be unlawful discriminatory practice for any person engaged in any activity to which this chapter applied to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter…"

200.     The NYSHRL similarly prohibits retaliation.

38

201.    As described herein, Defendants retaliated against Plaintiffs Lambert and Wiltz in violation of the NYCHRL and NYSHRL.

202.    Specifically, Defendants retaliated against Plaintiff Lambert in violation of the NYCHRL and NYSHRL for Plaintiff Lambert having, in good faith, opposed Defendant Stein's discriminatory practices by complaining to Defendants, and rejecting his advances. In response, Plaintiff Lambert was denied strong leads that would yield profitable commissions.

203.    Defendants' alleged reasons for denying Plaintiff Lambert robust leads as of June 2024 were entirely pretextual. In fact, this was done because Plaintiff Lambert had engaged in protected activity when she complained about the persistent and pervasive sexual harassment and hostile work environment in June of 2024.

204.    Similarly, Plaintiff Wiltz was fired for pretextual reasons in November 2023. Specifically, Defendants fired Plaintiff Wiltz because she engaged in protected activity when she requested a reasonable accommodation for her disability and when she complained about disparate treatment – namely, that New Start refused to allow her to work remotely, due to its racial bias, but allowed non-minority workers to work from home routinely.

205.    As a result of Defendants' discriminatory and retaliatory acts, Plaintiffs have suffered and will continue to suffer substantial losses, including loss of past and future earnings and other employment benefits, and are entitled to compensatory damages for, inter alia, mental anguish, emotional distress, humiliation, and loss of reputation.

206.    The Defendants' conduct was willful and motivated by malice and/or reckless indifference to Plaintiffs' legal rights, entitling them to an award of punitive damages.

**ELEVENTH CLAIM AGAINST DEFENDANTS RUSSINI AND ADELSTEIN**
**BY PLAINTIFFS LAMBERT AND WILTZ**

**(Aiding and Abetting Sexual Discrimination under the NYSHRL and NYCHRL)**

207.    Plaintiffs repeat and reallege the previous allegations as if fully stated herein.

208.    New York Executive Law Section 296(6) makes it "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so."

209.    Similarly, the New York City Administrative Code Section 8-107(6) makes it "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so."

210.    Defendants engaged in an unlawful discriminatory practice in violations of New York City Administrative Code Title 8, § 8-107(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory, unlawful and retaliatory conduct.

211.    Defendant Russini knew or should have known about the ongoing sexual and racial discrimination but failed entirely to prevent or correct the harassment and hostile work environment.

212.    Defendant Russini did not take any action to remedy the sexual harassment at New Start after receiving complaints from Plaintiff Lambert in June 2024.

213.    Defendant Russini did not take any action to remedy the racial discrimination at New Start after receiving complaints from Plaintiff Wiltz.

214.    Similarly, Defendant Adelstein knew or should have known about the ongoing sexual and racial discrimination but failed entirely to prevent or correct the harassment and hostile work environment.

40

215.    Defendant Adelstein did not take any action to remedy the racial discrimination at New Start after receiving complaints from Plaintiff Wiltz.

216.    As a result of the foregoing, Plaintiffs Lambert and Wiltz have suffered and will continue to suffer substantial losses, including loss of past and future earnings and other employment benefits, and have suffered other monetary damages and compensatory damages for, *inter alia*, mental anguish, emotional distress, humiliation, and loss of reputation.

217.    Defendants' conduct was willful and motivated by malice and/or reckless indifference to Plaintiffs' legal rights, entitling them to an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all other similarly situated persons respectfully request that this Court issue an order:

A.    Declaring that Defendants' conduct complained of herein is in violation of the Federal and New York State labor laws;

B.    Awarding Plaintiffs, the Class and other FLSA Collective unpaid minimum wages and overtime wages with liquidated damages, and interest;

C.    Awarding Plaintiffs, the Class and other FLSA Collective liquidated damages;

D.    Awarding Plaintiffs, the Class and other FLSA Collective damages due to violations of New York Labor Law § 195 for failure to provide required notices and pay statements;

E.    Awarding Plaintiffs, the Class and other FLSA Collective attorneys' fees and costs;

F.    Awarding Plaintiffs, the Class and other FLSA Collective pre- and post-judgement interest; and

G.  All damages which Plaintiffs have sustained as a result of Defendants' discriminatory and retaliatory conduct, including back pay, front pay, general and special damages for lost compensation and job benefits she would have received but for Defendants' conduct, and for emotional distress, humiliation, embarrassment, and anguish;

H.  Exemplary and punitive damages in an amount commensurate with Defendants' ability and so as to deter future malicious, reckless and/or intentional conduct;

I.  Awarding Plaintiffs, the Class and other FLSA Collective any such further relief as may be just and proper.

Dated: Syosset, New York
          October 23, 2024

Respectfully submitted,

BELL LAW GROUP, PLLC

By: /s/ *Chaya M. Gourarie*

Chaya M. Gourarie, Esq.
Jennifer Calamia, Esq.
116 Jackson Avenue
Syosset, New York 11791
(516) 280-3008
cg@belllg.com
jcalamia@belllg.com

*Attorneys for Plaintiffs and*
*Collective/Class Action*