```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  8/7/2025
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X
                                :
ALANA LAMBERT, *et al.*,            :
                                :
                       Plaintiffs,   :        1:24-cv-8055-GHW
                                :
            -v-               :       MEMORANDUM OPINION &
                                :            ORDER
NEW START CAPITAL LLC, *et al.*,    :
                                :
                    Defendants.   :
                                :
------------------------------------------------------------------- X
GREGORY H. WOODS, United States District Judge:

## I.    INTRODUCTION

On March 3, 2022, the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act (the "EFAA") was signed into law. The EFAA provides that at the election of a person alleging a dispute related to conduct constituting sexual assault or sexual harassment under federal, tribal, or state law, forced arbitration provisions and joint action waivers are unenforceable with respect to a "case" that relates to the alleged sexual assault or sexual harassment dispute. Courts in this district interpreting the EFAA have had to grapple with numerous questions, including the appropriate pleading standard for alleging conduct constituting sexual harassment, what constitutes conduct constituting sexual harassment under local law, and, most relevant in this case, what constitutes a "case" under the EFAA. Courts in this district have held that when the EFAA applies to the "case," it applies to all the claims of a plaintiff alleging conduct constituting sexual assault or sexual harassment, even those claims that do not relate to the alleged assault or harassment. This case presents a novel question in this Circuit: does the EFAA apply to all of the *plaintiffs* in a case, even those plaintiffs whose allegations do not relate to any alleged sexual assault or sexual harassment, so long as one plaintiff raises such allegations? The Court holds that the EFAA only applies to the plaintiffs alleging a dispute related to conduct constituting sexual assault or sexual harassment; the

other plaintiffs are bound by otherwise valid arbitration agreements.

The plaintiffs here are former sales representatives for Defendant New Start Capital LLC ("New Start").  Defendant Stein was a manager at New Start and is alleged to have engaged in sexually inappropriate conduct directed at Plaintiff Lambert.  In return for her acquiescence, he offered her profitable leads, which can result in larger commissions.  Stein gave Lambert those leads at the expense of other employees.  Stein is also alleged to have made racially derogatory remarks about Plaintiff Abouzaid.  Abouzaid was later terminated from New Start after reporting Stein's alleged harassment of Lambert.  Plaintiff Wiltz separately alleges that she faced racial and disability discrimination from Defendant Adelstein, New Start's CEO, when he refused to let her work remotely on account of her being a black woman.  Separately, Lambert, Abouzaid, and Plaintiff LeRouge allege that New Start failed to pay them proper overtime wages or proper commissions, in breach of their employment agreements and in violation of federal and state labor laws.

Defendants move to dismiss and to compel arbitration of most of Plaintiffs' claims.  Because Wiltz's allegations bear no relation to any of the federal claims asserted in this case or to any other plaintiff's claims, Wiltz's state law claims are dismissed for lack of subject matter jurisdiction. Because LeRouge does not allege conduct constituting a sexual harassment or sexual assault dispute, her claims must be arbitrated, pursuant to her arbitration agreement.  Because the remaining plaintiffs assert claims related to conduct constituting sexual harassment, their arbitration agreements are not enforceable with respect to this case.

## II.    BACKGROUND

### A.  Allegations in the First Amended Complaint[1]

#### 1.    Parties

Defendant New Start is a New York limited liability company with its principal place of business in New York.  Dkt. No. 23 ("FAC") ¶ 32.[2]  Defendant Robert Russini is a resident of New York and at all relevant times held the position of chief operating officer at New Start.  *Id.* ¶¶ 36–37. Defendant Dani Adelstein is a resident of New York and at all relevant times held the position of vice president of sales at New Start.  *Id.* ¶¶ 41–42.  Defendant Phil Stein is a resident of New York and at all relevant times held the position of senior manager of financial consulting at New Start.  *Id.* ¶¶ 46–47.

Plaintiff Alana Lambert is a resident of New Jersey who worked for New Start as a sales representative from December 2022 to November 2024.  *Id.* ¶ 27.  Plaintiff Kimarah LeRouge is a resident of New York who worked for New Start as a sales representative from December 2022 through July 2023.  *Id.* ¶ 28.  Plaintiff Erica Wiltz is a resident of Louisiana who worked for New Start as a sales representative in-training from October 2023 through November 2023.  *Id.* ¶ 29. Plaintiff Omnaya Abouzaid is a resident of New Jersey who worked for New Start as a sales representative from July 2023 to April 2024.  *Id.* ¶ 30.

#### 2.  Plaintiffs' Wages and Hours at New Start

Lambert was hired by New Start on or about December 5, 2022.  *Id.* ¶ 51.  LeRouge was hired on or about December 5, 2022.  *Id.* ¶ 92.  Wiltz was hired on or about October 30, 2023.  *Id.*

---

[1] All facts alleged in the FAC are accepted as true for the purposes of Defendants' first Rule 12(b)(6) motion to dismiss. *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court also considers all documents attached as exhibits to the FAC and incorporated by reference in the FAC. *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that in considering a motion to dismiss, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint").
[2] New Start formerly operated under the name "Titan Consulting Group, LLC."  FAC ¶ 33.

¶ 111.[3]  Abouzaid was hired on or about July 17, 2023.  *Id.* ¶ 131.  Their duties included, among other things, "following up on leads from callers to enroll debtors into [] New Start's debt settlement program."  *Id.* ¶¶ 55, 95, 117, 136.

Lambert's, LeRouge's, and Abouzaid's offer letters stated that their hourly rate would be $15 and that their overtime rate would be $22.50 per hour for all hours worked over 40 hours in a workweek.  *Id.* ¶¶ 60, 99, 140.  Lambert typically worked six days per week, from 8:00 a.m. to 9:00 p.m. Monday through Friday and from 11:00 a.m. to 3:00 p.m. on Saturdays.  *Id.* ¶ 58.  Occasionally, she would work Sundays from 10:00 a.m. to 3:00 p.m.  *Id.*  Lambert thus typically worked nearly seventy hours per week.  *Id.*  LeRouge typically worked six days per week, from 11:00 a.m. to 8:00 or 9:00 p.m. Monday through Friday and from 10:00 a.m. to 3:00 p.m. on Saturdays.  *Id.* ¶ 97.  LeRouge thus typically worked approximately fifty hours per week.  *Id.*  Abouzaid typically worked five days per week, from 10:00 or 11:00 a.m. through 8:00 or 9:00 p.m. each day.  *Id.* ¶ 138.  She occasionally worked additional hours as needed.  *Id.*  Abouzaid thus typically worked approximately fifty hours per week.  *Id.*

New Start also entered into commission agreements with Lambert, LeRouge, and Abouzaid (collectively the "FLSA Plaintiffs").  These agreements provided that the FLSA Plaintiffs would receive "commissions . . . based on the amount of debt clients successfully enrolled into a debt settlement program."  *Id.* ¶¶ 61, 100, 141.  However, the agreement provided that commission payments would be "less any wages advanced to [the employee] by [New Start] either on a salary or hourly basis as set forth in [the employee's] offer letter."  *Id.*  Per the commission agreement, "if an employee 'sign[s] a clients [sic] with $100,000 in debt and such clients successfully make two fee payments to the Company,' employees would be paid commissions 'during the month after it is earned with 50% of the commission to be paid in the first pay period of the following month and

---

[3] Defendants failed to conduct sexual harassment training upon hiring LeRouge and Wiltz.  FAC ¶¶ 109, 116.

50% to be paid in the second pay period of the following month.'" *Id.* ¶ 67 (alterations in original).

Despite working nearly seventy hours per week—at the demand of Stein—Lambert was paid for only forty hours per week of work. *Id.* ¶¶ 62–63. Similarly, LeRouge and Abouzaid were paid for only forty hours per week, despite typically working many more hours. *Id.* ¶¶ 101, 142. Any wage statements provided by Defendants "did not include the *actual* number of hours worked, including the number of overtime hours worked," and thus omitted "pay for overtime hours." *Id.* ¶¶ 69, 107, 148.

New Start did not record the FLSA Plaintiffs' overtime hours. *Id.* ¶¶ 62, 101, 103, 142. Plaintiffs allege that the failure to pay due wages was not limited to Lambert; it was Defendants' pattern and practice not to pay overtime wages to all their employees. *Id.* ¶ 66. Defendants also failed to provide the FLSA Plaintiffs with their commission payments in the month after the commission was earned, and such payments "frequently omitted applicable clients." *Id.* ¶¶ 67, 105, 146.

Plaintiffs also entered into agreements with New Start "to use binding arbitration as the sole and exclusive means to resolve all disputes that may arise between [the employee] and [New Start] . . . including, but not limited to, disputes regarding termination of employment and compensation." Dkt. No. 63-1 § 10. The agreements further constituted a "waiver of any substantive or procedural rights that [the employee] . . . may have to bring an action on a class, collective, or other similar basis." *Id.*

### 3. Lambert Experiences Harassment

While employed at New Start, Lambert, a Black woman, was directly supervised by Stein and Adelstein, two white men. *Id.* ¶¶ 52–54. Lambert's duties included "following up on leads from callers to enroll debtors into [] New Start's debt settlement program." *Id.* ¶ 55. New Start did not distribute its leads blindly; rather, leads were distributed by managers—initially Stein and later Paris

Stamos, the assistant manager. *Id.* ¶ 56. This method of distributing leads allowed Stein to provide the most "profitable leads to employees he favored." *Id.*

From the very beginning of her time at New Start, Stein made "crude sexual comments" toward Lambert during the workday, "sen[t] [Lambert] salacious text messages," gave Lambert "inappropriate gifts," and made "sexual advances." *Id.* ¶ 73. For example, Stein sent the following messages, among others, to Lambert while acting as her supervisor:

- "Of all the things I can cash app and help my Bestie with, $100 for a little laser to the C**ch and maybe a** area would definitely be one of them. Obviously, I would need to make sure they did a good job!!!! As best friends do!!! Lmaoo." *Id.* ¶ 73.

- "Speaking of personal a** sex pics that you don't send me. Have you tried the camera yet? Did it get sh*t on?" *Id.* ¶ 76.

- "Real a** pics between friends are taken in sexy underwear." *Id.*

- "We fool around on text and what we joke about but if you ever have an issue with anything or me pointing out that you or your outfit is unbelievably sexy. Let me know. Either way I'll still be your sugar daddy lawyer." *Id.* ¶ 77.

- "At least you know I won't be a broke baby daddy!!! Only the best for my girls!!! Lolol." *Id.*

Stein also sent Lambert "a picture of himself in boxers." *Id.* ¶ 76. Further, Stein referred to himself repeatedly as "Sugar Daddy" or "Baby Daddy." *Id.* ¶ 74.

On one day in September 2023, "Stein took [] Lambert to a strip bar and paid for [] Lambert to have a lap dance." *Id.* ¶ 75. The situation "escalated to [the stripper] giving oral sex to [] Lambert while Stein watched." *Id.* "Thereafter [] Stein made repeated references to seeing [that stripper] again with [] Lambert." *Id.*

Stein also awarded Lambert "the best sales leads because he favored her." *Id.* ¶ 164.

Embedded in his salacious text messages were "many repeated references to [such] leads." *Id.* ¶ 79. Stein made statements such as "Hey Lambert[,] [o]bviously you're my favorite and I wanna make sure you make a ton of money," "I told them not to f**k around and give you some real leads," and "my favorite person gets the most and best[,] [t]ry not to let vasic, or anyone else for that matter, know how many you get." *Id.* ¶¶ 77, 79; *see also id.* ¶ 79 ("You got the best ones . . . . And keep the quality quiet please. If bigger ones come I'll send."). Stein was "focus[ed] solely on Lambert" such that "male employees on [] Stein's team complained that he provided no support to them, only coached [] Lambert, and exhibited an obsessive focus on her." *Id.* ¶ 178.

Adelstein also made "inappropriate sexual remarks" to Lambert. *Id.* ¶ 80. He referred to Lambert as a "smoke show" in public speeches, asked her to "twirl" at a company dinner, and told her that he had "raunchy dreams about her." *Id.* He also referred to Lambert as a "hot model" to a male coworker. *Id.* Like Stein, Adelstein "frequently reminded [] Lambert that he had the power and ability to give her profitable leads." *Id.* ¶ 81.

### 4. Abouzaid Receives Racially Charged Comments and Assignments

Abouzaid is a woman "of African race and Arab Egyptian national origin." *Id.* ¶ 133. Abouzaid's direct supervisors were Adelstein and Paris Stamos, two white men. *Id.* ¶¶ 134–35. Adelstein assigned Abouzaid leads "that had 'ethnic' names" and denied her leads "that had 'white' sounding names." *Id.* ¶ 152. Abouzaid confronted Adelstein about the nature of her leads, but he "did nothing." *Id.* ¶ 153. Stein and other New Start employees would "mockingly and derogatorily" refer to Abouzaid as "Palestinian or 'the Palestinian,'" even though she is Egyptian. *Id.* ¶ 154. Adelstein was aware of this conduct but failed to stop or address it. *Id.* ¶ 157. After Abouzaid's termination, Stein told Lambert that New Start would "throw a few dollars at that dirty Palestinian," referencing a potential settlement with Abouzaid. *Id.* ¶ 159.

### 5.  Abouzaid Complains About Stein's Conduct and Is Terminated

Abouzaid was aware of Stein's conduct toward Lambert, including "overt sexual gestures . . . in the workplace." *Id.* ¶ 162.  Stein's conduct "made other employees uncomfortable." *Id.* ¶ 167.  Abouzaid "feared that she would similarly be subjected to sexual harassment or be pressured into tolerating Stein's inappropriate behavior . . . in order to receive good leads." *Id.* ¶ 166.

On April 11, 2024, Abouzaid became aware that Stein and Stamos would become "the main distributors of sales leads." *Id.* ¶ 160.  That same day, Abouzaid told Adelstein not to appoint Stein as the primary assigner because of his conduct toward Lambert and because she feared that she would be subject to similar sexual or inappropriate behavior.  *Id.* ¶ 169.  Abouzaid specifically described Stein's conduct to Adelstein, but Adelstein "became immediately defensive" and "questioned why [] Abouzaid believed the conduct constituted sexual harassment."  *Id.* ¶¶ 170–79. Adelstein said that Stein "is beloved by management and is not going anywhere."  *Id.* ¶ 180.

The following day, April 12, 2024, Adelstein informed Abouzaid that she was being terminated.  *Id.* ¶¶ 183–89.  When she got up to leave, Adelstein and another manager, Andrew Murphy, blocked the door.  *Id.* ¶ 190.  She told them, "You're firing me for complaining about the sexual harassment of Alana Lambert."  *Id.* ¶ 191.  Murphy responded, "Naya, shut up.  You need to grow up." *Id.* ¶ 193.  Abouzaid was still prevented from leaving, and then two additional managers, Russini and Victor Bousso, entered.  *Id.* ¶ 195.  Abouzaid asked for their stated reason for her termination, to which Adelstein replied, "insubordination and refusal of leads from a manager."  *Id.* ¶ 198.  However, "another employee, Natalia, frequently refused leads without consequence."  *Id.* ¶ 200.

The confrontation lasted about twenty minutes.  *Id.* ¶ 195.  Finally, still blocked from exiting the room, Abouzaid asked if she was being detained.  *Id.* ¶¶ 201–02.  Adelstein responded,

"Okay, you can leave, as long as you leave and don't say anything." *Id.* ¶ 203.

### 6. Defendants Conduct an Investigation into Stein, but He Faces No Punishment and Continues His Behavior

After Abouzaid's termination, New Start commenced a "sham investigation." *Id.* ¶ 83. The investigation "did not reveal any of [] Stein's grossly inappropriate text and Instagram messages" because "Stein conveniently deleted them." *Id.* New Start did nothing to retrieve the messages. *Id.* In June 2024, Russini questioned Lambert about Stein's conduct, and Lambert described the salacious text messages and sexual advances. *Id.* ¶ 84. In response, "no corrective action was taken." *Id.* ¶ 85. Stein was "merely 'written up' for sexual misconduct" in July 2024, but this write-up had "no real consequences." *Id.* Neither Russini nor Adelstein disciplined Stein or prevented him from engaging in similar misconduct going forward. *Id.* ¶¶ 87, 88. Thus, Stein "continued to make vulgar comments and suggestions towards [] Lambert in person and via text messages." *Id.* ¶ 85.

However, after she complained about Stein in June 2024, "she began receiving leads that had very little value, [] lowering her commissions significantly." *Id.* ¶ 90. Then, in August 2024, her leads became "significantly worse." *Id.*

After Lambert filed this action on October 23, 2024, the quality of her leads "plummeted" further, and Adelstein "assumed an aggressive manner towards her." *Id.* ¶ 91. He slammed the door "in an intimidating manner," spoke to Lambert "in an aggressive tone," and dismissed her concerns. *Id.* "Lambert was compelled to resign her employment on November 4, 2024." *Id.*

### 7. Wiltz Is Prevented from Working Remotely

While at New Start, Wiltz, a Black woman, was directly supervised by Stein and Adelstein, two white men. *Id.* ¶¶ 113–15. Wiltz "suffers from post-surgical scoliosis with chronic pain and spinal degenerative issues." *Id.* ¶ 120. She also "suffers from chronic pain related to bulging discs, osteoarthritis, and spinal stenosis." *Id.* "Initially, [] New Start had promised [] Wiltz that she would

be able to work remotely after three months, and she started her employment with Defendants based on that material representation." *Id.* ¶ 118.

On or about November 27, 2023, Wiltz asked Adelstein for "permission to work remotely before the completion of three months' work due to her disability." *Id.* ¶ 119. Many New Start employees work remotely. *Id.* ¶ 122. Adelstein initially agreed to Wiltz's request; however, the following day, Adelstein told her that "the owner of New Start had decided to deny [] Wiltz the option of working remotely at any time." *Id.* ¶¶ 123–24. She would not be allowed to work remotely at that time or after three months of work. *Id.* ¶ 124. Adelstein told her that New Start has "had problems with people like [her] in the past," referring to another Black female employee who had "abused the privilege" of remote work. *Id.* Wiltz reminded Adelstein that New Start had represented to her that remote work would be an option and that her request was based on her disability. *Id.* ¶ 125. "Adelstein did not engage in an interactive process for evaluating a reasonable accommodation." *Id.* ¶ 126. Instead, Adelstein directed Wiltz to resign and dictated her resignation letter for her "word for word." *Id.* ¶ 127. Adelstein later told Stein and a group of other men that Wiltz "had been hired as 'eye candy.'" *Id.* ¶ 129.

### B. New Allegations in the Proposed Second Amended Complaint

On March 21, 2025, Plaintiffs filed a Proposed Second Amended Complaint, Dkt. No. 76-1 ("PSAC"), adding to the allegations in the FAC. The PSAC primarily adds the allegations of three new potential plaintiffs: Matthew Jamele, Mladen Vasic, and Joseph Jacobs. *See* PSAC ¶¶ 24–26. Jamele is a resident of New York and worked as a sales representative for New Start from September 2022 to December 2024. *Id.* ¶ 35. Jamele was Lambert's boyfriend during all relevant times. *Id.* ¶ 240. Vasic is a resident of New Jersey and worked as a sales representative for New Start from February 2018 to June 2024. *Id.* ¶ 36. Jacobs is a resident of Florida and worked for New Start as a sales representative from January 2018 to July 2024. *Id.* ¶ 37.

Plaintiffs also add the allegation that the commission pay structure changed on or about January 2023: commission payments were stretched out over three months. *Id.* ¶ 75. The percent of the payment paid out each month was changed multiple times over the next two years. *Id.*

### 1. Jamele's Allegations

Jamele was subject to the same wage and hours terms as the FLSA Plaintiffs. *See id.* ¶¶ 229–30. Like Plaintiffs, he alleges that he worked more than forty hours per week, *id.* ¶ 227, but was only paid for forty hours, *id.* ¶ 231. He also received commission payments, but, like the FLSA Plaintiffs, he alleges that he was paid less than he was owed in commissions and did not receive those payments timely. *Id.* ¶ 234. He further alleges that he was not furnished with an accurate wage notice upon hiring or accurate wage statements each pay period. *Id.* ¶¶ 236–37.

Jamele also alleges that Stein "repeatedly condemned [him], insulted him, treated him with hostility and also denied him profitable leads." *Id.* ¶ 241. Specifically, Stein sent text messages to Lambert insulting Jamele and stating that Lambert deserved someone better than Jamele. *Id.* ¶ 242. Lambet told Jamele about these messages. *Id.* ¶ 241. Jamele alleges that he "receiv[ed] inferior leads" which led to "smaller commissions" because of Stein's feelings towards him and Lambert. *Id.* ¶¶ 245–46. Stein's hostility only increased after Lambert reported Stein's conduct; and the quality of Jamele's leads further decreased. *Id.* ¶ 247. Stamos later confirmed to Jamele that Stein had been "giving him leads that were less profitable." *Id.* ¶ 248.

### 2. Vasic's Allegations

Vasic asserts functionally the same wage, hour, and notice allegations as the FLSA Plaintiffs and Jamele. *See id.* ¶¶ 250–65. Vasic also alleges that Stein "treated him with hostility and also denied him profitable leads." *Id.* ¶ 266. Stein sent text messages to Lambert indicating that he gave her better leads than he gave to Vasic. *Id.* ¶ 267. "Because [] Stein's lead distribution was based on favoritism and the expectation of sexual favors from female employees, Vasic, a male, was regularly

denied favorable leads," adversely impacting his compensation.  *Id.* ¶ 268.

### 3.  Jacobs's Allegations

Jacobs asserts functionally the same wage, hour, and notice allegations as the FLSA Plaintiffs, Jamele, and Vasic.  *See id.* ¶¶ 269–282.

## C.  Procedural History

Plaintiffs commenced this action on October 23, 2024.  Dkt. No. 1.  Plaintiffs filed the FAC on December 18, 2024.  Dkt. No. 23.  On March 7, 2025, Defendants filed a motion to dismiss the FAC and to compel arbitration of some of Plaintiffs' claims.  Dkt. No. 62.  Defendants also moved in the alternative to stay this case pending arbitration.  *See id.*  Defendants filed an accompanying memorandum of law.  Dkt. No. 64.  Plaintiffs filed their opposition on April 24, 2025.  Dkt. No. 88.  Defendants filed their reply on May 12, 2025.  Dkt. No. 96.

On March 21, 2025, Plaintiffs filed a motion to amend the FAC, Dkt. No. 74, attaching the PSAC, Dkt. No. 76-1.  On May 2, 2025, Defendants filed a memorandum of law in opposition to the motion to amend and a cross motion to compel arbitration and to dismiss the proposed second amended complaint.  Dkt. Nos. 92, 93, 95.  Plaintiffs filed a reply to the motion to amend and opposition to the cross motion on May 23, 2025.  Dkt. No. 99.  Defendants filed a sur-reply on June 3, 2025.  Dkt. No. 101.

## III.  LEGAL STANDARD

### A.  Rule 12(b)(1) Motion to Dismiss

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Daly v. Citigroup Inc.*, 939 F.3d 415, 425 (2d Cir. 2019) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)); see also Fed. R. Civ. P. 12(b)(1) ("[A] party may assert the following defense[] by motion: lack of subject-matter jurisdiction.").  "The burden of proving jurisdiction is on the party asserting

it." *Daly*, 939 F.3d at 425 (quoting *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994)). On a Rule 12(b)(1) motion, "the court is permitted to rely on information beyond the face of the complaint." *In re Germain*, 824 F.3d 258, 261 (2d Cir. 2016) (quoting *St. Paul Fire & Marine Ins. Co. v. Universal Builders Supply*, 409 F.3d 73, 80 (2d Cir. 2005)).

### B.  Rule 12(b)(6) Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[ ]" claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). However,

> "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." A complaint must therefore contain more than "naked assertion[s] devoid of further factual enhancement." Pleadings that contain "no more than conclusions . . . are not entitled to the assumption of truth" otherwise applicable to complaints in the context of motions to dismiss.

*DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87–88 (2d Cir. 2013) (alterations in original) (quoting

*Iqbal*, 556 U.S. at 678–79).  Thus, a complaint that offers "labels and conclusions" or "naked

assertion[s]" without "further factual enhancement" will not survive a motion to dismiss.  *Iqbal*, 556

U.S. at 678 (alteration in original) (citing *Twombly*, 550 U.S. at 555, 557).

On a motion to dismiss, a court must generally "limit itself to the facts stated in the

complaint."  *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006) (quoting *Hayden v.

Cnty. of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999)).  In that context, "[a] court's task is to assess the legal

feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on

either side."  *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020).  "The purpose of Rule

12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a

claim for relief *without* resolving a contest regarding its substantive merits.  The Rule thus assesses

the legal feasibility of the complaint, but does not weigh the evidence that might be offered to

support it."  *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006).

### C. Motion to Compel Arbitration

Section 4 of the Federal Arbitration Act (the "FAA") provides that parties can petition the

district court for an order compelling arbitration.  *See* 9 U.S.C. § 4.  Section 4 of the FAA provides:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under
> a written agreement for arbitration may petition any United States district court which,
> save for such agreement, would have jurisdiction under title 28, in a civil action or in
> admiralty of the subject matter of a suit arising out of the controversy between the
> parties, for an order directing that such arbitration proceed in the manner provided
> for in such agreement.

9 U.S.C. § 4.  A party has "refused to arbitrate" within the meaning of Section 4 if it "commences

litigation or is ordered to arbitrate the dispute by the relevant arbitral authority and fails to do so."

*LAIF X SPRL v. Axtel, S.A. de C.V.*, 390 F.3d 194, 198 (2d Cir. 2004) (citation and brackets

omitted); *see also Jacobs v. USA Track & Field*, 374 F.3d 85, 89 (2d Cir. 2004) (finding no refusal to

arbitrate where respondents had neither commenced litigation nor failed to comply with an order to

arbitrate).

In order to determine whether an action should be sent to arbitration, courts in this Circuit engage in the following inquiry:

> [F]irst, [the court] must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration.

*JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004) (quoting *Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 75–76 (2d Cir. 1998)).  "In deciding a motion to compel arbitration, 'the role of courts is limited to determining two issues: i) whether a valid agreement or obligation to arbitrate exists, and ii) whether one party to the agreement has failed, neglected or refused to arbitrate.'"  *Beijing Shougang Mining Inv. Co. v. Mongolia*, 11 F.4th 144, 162 (2d Cir. 2021) (quoting *LAIF X SPRL*, 390 F.3d at 198).

"It has long been settled that arbitration is a matter of contract and that, therefore, a party cannot be compelled to arbitrate issues that a party has not agreed to arbitrate."  *Id.* at 567 (citations omitted).  "The question of whether the parties have agreed to arbitrate, *i.e.*, the 'question of arbitrability,' is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise."  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (citation omitted) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)).  "This principle flows inexorably from the fact that arbitration is simply a matter of contract between the parties."  *Id.* (quotation and brackets omitted); *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (holding that "arbitration is a matter of contract" (quotation omitted)); *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (holding that, with respect to an arbitration agreement, "as with any other contract, the parties' intentions control" (quotation omitted)).  Hence, "[t]he threshold question of whether the parties indeed agreed to arbitrate is determined by state contract law principles."  *Nicosia*, 834 F.3d at 229 (citation omitted).

15

However, "[t]he Supreme Court has interpreted the FAA broadly, finding a 'liberal federal policy favoring arbitration agreements.'" *Bynum v. Maplebear Inc.*, 160 F. Supp. 3d 527, 533 (E.D.N.Y. 2016) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)) (brackets omitted). Furthermore, "[t]he Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25.

"[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp. Alabama v. Randolph*, 531 U.S. 79, 91 (2000) (citations omitted); *see also Application of Whitehaven S.F., LLC v. Spangler*, 45 F. Supp. 3d 333, 342–43 (S.D.N.Y. 2014) ("Whether it argues that arbitration is improper because the arbitration agreement is invalid under a defense to contract formation, or asserts that the arbitration contract does not encompass the claims at issue, either way, the resisting party shoulders the burden of proving its defense." (quotation omitted)). If the Court determines "that an arbitration agreement is valid and the claim before it is arbitrable, it must stay or dismiss further judicial proceedings and order the parties to arbitrate." *Patterson v. Raymours Furniture Co.*, 96 F. Supp. 3d 71, 75 (S.D.N.Y. 2015) (quotation omitted).

## IV.    DISCUSSION

### A.  Subject Matter Jurisdiction

Defendants move to dismiss Plaintiffs' state and city human rights law claims for lack of subject matter jurisdiction. It is undisputed that the Court has federal question jurisdiction over the FLSA Plaintiffs' federal wage claims. Because Lambert's and Abouzaid's state law claims share common facts with the FLSA claims, the Court exercises supplemental jurisdiction over Lambert's and Abouzaid's state claims. Because Wiltz's claims, which all arise under state law, share no

overlapping facts with any other plaintiff's claims, the Court declines to exercise supplemental jurisdiction over Wiltz's claims.

When a district court has original jurisdiction over claims in a case, it "'shall have supplemental jurisdiction over all other claims that are so related to claims in the action . . . that they form part of the same case or controversy under Article III.'" *F5 Capital v. Pappas*, 856 F.3d 61, 77 (2d Cir. 2017) (quoting 28 U.S.C. § 1367(a)); *see also United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966) ("Pendent jurisdiction . . . exists whenever there is a claim 'arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority,' and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case.'" (quoting U.S. Const. art. III, § 2)).

Claims are "'part of the same case or controversy' if they 'derive from a common nucleus of operative fact.'" *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 245 (2d Cir. 2011) (quoting *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004)). "Put differently, the question at hand is whether the relationship between the federal and state claims is 'such that the plaintiff would ordinarily be expected to try them all in one judicial proceeding.'" *LaChapelle v. Torres*, 37 F. Supp. 3d 672, 680 (S.D.N.Y. 2014) (quoting *Montefiore Med. Ctr. v. Teamsters Local 272*, 642 F.3d 321, 332 (2d Cir.2011)). "To make this determination, courts 'have traditionally asked whether the facts underlying the federal and state claims substantially overlapped . . . [or] the federal claim necessarily brought the facts underlying the state claim before the court.'" *Id.* (alterations in original) (quoting *Achtman v. Kirby, McInerney & Squire LLP*, 464 F.3d 328, 335 (2d Cir. 2006)).

### 1.    The Court Lacks Subject Matter Jurisdiction over Wiltz's Claims

The Court lacks subject matter jurisdiction over Wiltz's claims, asserted exclusively under New York state and city law. Wiltz's claims share no common allegations with the claims of the

other plaintiffs in this action. Wiltz's race-based discrimination claims center around the denial of remote work; Abouzaid's race-based discrimination claims center around discriminatory comments and lead assignments. Plaintiffs do not allege that Wiltz was aware of any of the discriminatory conduct directed at Abouzaid, and therefore Wiltz's race-based hostile work environment allegations do not plausibly overlap with Abouzaid's. Further, Wiltz alleges discrimination regarding her work location, not her compensation or leads; therefore, Wiltz's allegations do not overlap with the FLSA Plaintiffs' wage claims. Plaintiffs provide no substantive argument for why "Wiltz's claims are inextricably bound to those asserted by the remaining [p]laintiffs." Dkt. No. 88 at 24. Plaintiffs simply assert that there is "substantial overlap." *Id.* at 22. From the face of the complaint, there is in fact no overlap apart from the identity of the defendants. Therefore, the Court does not have supplemental jurisdiction over Wiltz's claims, asserted exclusively under state law.

### 2. The Court Has Subject Matter Jurisdiction over Lambert's and Abouzaid's Human Rights Law Claims

Because Lambert's and Abouzaid's state discrimination and hostile work environment claims derive from operative facts that overlap substantially with each other and with the federal wage claims, the Court has supplemental jurisdiction over those claims. Lambert and Abouzaid allege that their sales leads, and by extension their compensation on commission, were dependent on the discretion of their managers. Further, they allege that Stein abused that discretion by tying leads and compensation to acquiescing to his sexually harassing conduct. Stein promised Lambert more leads and "a ton of money" because of their allegedly inappropriate relationship, FAC ¶ 77, and later withheld leads after Lambert reported Stein's behavior, *id.* ¶ 90. *See Rivera v. Ndola Pharm. Corp.*, 497 F. Supp. 2d 381, 393 (E.D.N.Y. 2007) ("[P]laintiff's claim of sexual harassment is relevant to the issue of plaintiff's wages because she alleges N. Patel decreased her wages after she refused him."). The facts underlying the hostile work environment claims therefore also speak to the alleged failure

to pay proper wages.[4]  Thus, there is a common nucleus of operative facts sufficient for the Court to exercise supplemental jurisdiction at this stage.[5]  *Compare Munguia v. Bhuiyan*, No. 11-cv-3581 (JBW) (MDG), 2012 WL 526541, at *3 (E.D.N.Y. Feb. 16, 2012) (exercising supplemental jurisdiction where "plaintiff has sufficiently alleged that . . . defendants decreased his wages as a result of unlawful discrimination" (internal quotation marks and brackets omitted)), *with Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 468 (S.D.N.Y. 2008) (declining supplemental jurisdiction because the company "d[id] not allege, for instance, that [it] did not pay Torres and Chewning premium overtime compensation because of their alleged misconduct").

### 3. The FLSA Plaintiffs Have Standing to Pursue Their NYLL § 195(3) Wage Statement Claims

Defendants also move to dismiss the FLSA Plaintiffs' NYLL § 195(3) claim for lack of standing.  Because Plaintiffs plausibly allege that by failing to provide accurate wage statements, Defendants were able to conceal the extent of their wage and hour violations, the FLSA Plaintiffs have Article III standing to assert NYLL § 195(3) claims.  Under NYLL § 195(3), employers are required to provide employees with a wage statement "with every payment of wages."  N.Y. Lab. Law § 195(3).  The wage statement must include, among other things, "the dates of work covered by that payment of wages; . . . rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed

---

[4] The Court notes that Plaintiffs, for purposes of establishing supplemental jurisdiction, argue that the commission payments are "directly related to the Defendants' failure to pay Plaintiffs minimum wage [and] overtime."  Dkt. No. 88 at 25–26.  Meanwhile in the FAC, Plaintiffs explicitly allege that "the commission check does not satisfy Defendants' obligations to pay overtime wages."  FAC ¶ 63.  Plaintiffs cannot have their cake and eat it too—linking commission payments with the wage-and-hour violations for purposes of federal jurisdiction but disclaiming any link for purposes of wage-and-hour liability.  The FLSA does not exclude commissions from an employee's "regular rate" of pay.  *See* 29 U.S.C. § 207; *Flick v. Am. Fin. Resources, Inc.*, 907 F. Supp. 2d 274, 278 (E.D.N.Y. 2012).  And according to the NYLL, "a 'commission' is considered a 'wage.'"  *Pachter v. Bernard Hodes Grp., Inc.*, 10 N.Y.3d 609, 616–17 (2008) (citing N.Y. Lab. Law § 190(1)).  Thus, while Plaintiffs may have a contractual claim that they were entitled to both minimum / overtime wages and commissions separately, the Court cannot at this time determine that Plaintiffs' commission payments should be ignored for purposes of establishing NYLL and FLSA liability.

[5] For the same reasons, the Court has supplemental jurisdiction over Jamele's and Vasic's proposed human right law claims, which involve allegations that Stein deprived them of profitable leads on account of their gender.

as part of the minimum wage; . . . and net wages." *Id.*

"Article III restricts federal courts to the resolution of cases and controversies. . . . That restriction requires that the party invoking federal jurisdiction have *standing*—the personal interest that must exist at the commencement of the litigation." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55 (2d Cir. 2016) (alterations in original) (quoting *Davis v. Federal Election Commission*, 554 U.S. 724, 732–33 (2008)). "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Guthrie v. Rainbow Fencing Inc.*, 113 F.4th 300, 304 (2d Cir. 2024) (quoting *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017)).

To establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "Article III standing requires a concrete injury even in the context of a statutory violation." *Guthrie*, 113 F.4th at 305 (quoting *TransUnion*, 594 U.S. at 426). "[O]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Id.* at 306 (quoting *TransUnion*, 594 U.S. at 427) (emphasis in original).

"In light of [*TransUnion LCC v. Ramirez*], . . . a plaintiff cannot rely on 'technical violations' of the [NYLL] but must allege actual injuries suffered as a result of the alleged wage notice and wage statement violations." *Id.* at 305. "[A] plaintiff must show some causal connection between the lack of accurate notices and the downstream harm." *Id.* at 308. "[U]nless the plaintiff-employee can show that he or she . . . plausibly would have avoided some actual harm or obtained some actual benefit if accurate notices had been provided, the plaintiff-employee has not established a concrete injury-in-fact sufficient to confer standing to seek statutory damages under § 195." *Id.*

"Because the elements of Article III standing 'are not mere pleading requirements but rather

an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.'" *Id.* at 308–09 (quoting *Lujan*, 504 U.S. at 561). "When [a] Rule 12(b)(1) motion is facial, *i.e.,* based solely on the allegations of the complaint . . . , [t]he task of the district court is to determine whether the [complaint] alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (internal quotation marks and brackets omitted); *see also Guthrie*, 113 F.4th at 309 ("[T]he plaintiff-employee must support a plausible theory as to *how* he was injured by the defendants' failure to provide the required documents." (internal quotation marks omitted) (emphasis in original)).

"Following *Guthrie*, courts in this Circuit are in agreement that a plaintiff has standing if he or she plausibly alleges that, by failing to provide the required wage statements, the employer was able to hide its violations of wage and hour laws and thus prevent the employee from determining and seeking payment for the precise amount of his unpaid wages." *Cortez v. Brand Name 99 Cents & Up Corp.*, No. 24-cv-5262 (LJL), 2025 WL 1251297, at *6 (S.D.N.Y. Apr. 30, 2025) (internal quotation marks and brackets omitted); *see, e.g.*, *id.* ("Defendant's failure to provide wage notices and accurate wage statements prevented him from accurately calculating his rightful wages and from fully understanding and asserting his rights regarding his wages." (internal quotation marks and brackets omitted)); *Castillo v. Hollis Delicatessen Corp.*, No. 22-cv-5476 (AMD) (PK), 2024 WL 4107258, at *2 n.1 (E.D.N.Y. Sept. 6, 2024) ("The plaintiff alleges that the defendants were able to hide their violations of wage and hour laws and take advantage of Plaintiff's relative lack of sophistication by failing to provide her with wage information."); *Herrera v. Comme Des Garcons, Ltd.*, No. 21-cv-4929 (VEC) (SLC), 2024 WL 4664820, at *3 (S.D.N.Y. Sept. 11, 2024), *report and recommendation adopted*, No. 21-cv-4929, 2024 WL 4467153 (S.D.N.Y. Oct. 10, 2024) ("Plaintiffs allege that Defendants'

omission of the regular and overtime rates of pay from their wage notices and wage statements denied them the ability to identify their wage deficiencies earlier." (internal quotation marks and brackets omitted)); *see also Metcalf v. TransPerfect Translations Int'l, Inc.*, No. 19-cv-10104 (ER) (KHP), 2023 WL 2674743, at *6 (S.D.N.Y. Mar. 29, 2023) (explaining that the wage statements "did not include a tabulation of hours and overtime, [] which thereby prevented them from knowing whether, and to what extent, they had been underpaid").

Here, the FLSA Plaintiffs plausibly allege that they suffered a concrete injury as a result of Defendants' failure to provide accurate wage statements. The FLSA Plaintiffs do not allege that wage statements were not provided at all. Instead, the FLSA Plaintiffs allege that the provided wage statements "did not include the *actual* number of hours worked, including the number of overtime hours worked, and pay for overtime hours." FAC ¶¶ 69, 107, 148. They further allege that "Defendants' failure to provide [the FLSA Plaintiffs] with . . . accurate pay stubs with each payment throughout [their] employment . . . effectively concealed from [them], or interfered with [their] ability to identify and assess the wage violations." FAC ¶¶ 70, 108, 149. Because the hours listed on their wage statements did not reflect the actual hours they allegedly worked, the FLSA Plaintiffs were "prevented [] from determining and seeking payment for the precise amount of [their] unpaid wages."[6] *Kaur v. Natasha Accessories Ltd.*, No. 23-cv-6948 (JPO), 2024 WL 3429129, at *4 (S.D.N.Y. July 16, 2024); *contra Neor v. Acacia Network, Inc.*, No. 22-cv-4814 (ER), 2023 WL 1797267, at *4 (S.D.N.Y. Feb. 7, 2023) (holding that where the plaintiffs "admit[ted] that Acacia furnished wage statements that would show a lower number of hours recorded than Plaintiffs actually worked," it was "not a plausible injury" that the plaintiffs were "deprived . . . of the ability to contest the

---

[6] *Guthrie* defeats Defendants' argument that the failure to receive wages is not an injury in fact related to the failure to furnish accurate wage statements. *See* Dkt. No. 96 at 16. "[A] plaintiff-employee who has plausibly shown that defective notices led him or her to lose wages has such a concrete interest and is not simply policing legal infractions in the abstract." *Guthrie*, 113 F.4th at 310.

Defendants' calculations" because "[t]he inaccuracies in the wage statements would immediately alert the Plaintiffs to the fact that they were not being properly compensated").

### B. Motion to Compel Arbitration

Because the EFAA prevents enforcement of Lambert's and Abouzaid's arbitration agreements, their claims are not arbitrable.  LeRouge's claims, however, are not covered by the EFAA, and therefore the Court gives effect to LeRouge's arbitration agreement.

### 1. The Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act

The Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 amended the FAA by carving out an exception to section 4.  The EFAA provides:

> Notwithstanding any other provision of this title, at the election of the person alleging conduct constituting a sexual harassment dispute or sexual assault dispute, or the named representative of a class or in a collective action alleging such conduct, no predispute arbitration agreement or predispute joint-action waiver shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to the sexual assault dispute or the sexual harassment dispute.

9 U.S.C. § 402(a).  A "sexual harassment dispute" is "a dispute relating to conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law."  9 U.S.C. § 401(4).

Courts in the Southern District have almost uniformly employed a "plausibility standard" in determining whether a plaintiff has "alleged" conduct constituting sexual harassment.  *See Yost v. Everyrealm, Inc.*, 657 F. Supp. 3d 563, 585–88 (S.D.N.Y. 2023); *Brazzano v. Thompson Hine LLP*, No. 24-cv-01420 (ALC) (KHP), 2025 WL 963114, at *6 (S.D.N.Y. Mar. 31, 2025) (collecting cases); *Singh v. Meetup LLC*, 750 F. Supp. 3d 250, 253 (S.D.N.Y. 2024), *reconsideration denied*, No. 23-cv-9502 (JPO), 2024 WL 4635482 (S.D.N.Y. Oct. 31, 2024) (collecting cases).  Judge Liman, in a case now up on appeal before the Second Circuit, disagreed, reasoning that "the EFAA speaks to 'allegations,' *i.e.* the content of a pleading, and not to the conclusion that those allegations plausibly state a claim for relief if the pleading is challenged under Rule 12(b)(6)."  *Diaz-Roa v. Hermes L., P.C.*, 757 F. Supp. 3d

498, 535 (S.D.N.Y. 2024).  Because, as discussed below, the Court finds that Lambert and Abouzaid plausibly plead sexual harassment disputes under the NYCHRL, the Court need not weigh in on whether the appropriate standard in EFAA cases is the higher 12(b)(6) standard or Judge Liman's allegation standard.  *See Brazzano*, 2025 WL 963114, at *7 ("[T]he question of whether the predominant view or Judge Liman's less stringent threshold is correct is irrelevant here:  at least one of Brazzano's sexual harassment claims are plausible under *Twombly* and *Iqbal*.").

### 2.  The EFAA Prevents Arbitration of Lambert's and Abouzaid's Cases

Defendants concede that Lambert's human rights law claims relate to conduct constituting sexual harassment and are therefore covered by the EFAA.  Abouzaid's retaliation claim likewise relates to conduct constituting sexual harassment and is therefore likewise covered by the EFAA.  The Second Circuit has made clear that "retaliation resulting from a report of sexual harassment is 'relat[ed]' to conduct that is alleged to constitute sexual harassment.'"  *Olivieri v. Stifel, Nicolaus & Co., Inc.*, 112 F.4th 74, 92 (2d Cir. 2024) (quoting 9 U.S.C. § 401(4)).  Abouzaid claims that she was fired for reporting Stein's sexual harassment in the workplace.  Therefore, Abouzaid alleges a "dispute relating to conduct that is alleged to constitute sexual harassment."  9 U.S.C. § 401(4).  Her case, "relate[d] to . . . the sexual harassment dispute," is therefore covered by the EFAA.  9 U.S.C. § 402(a).[7]

The EFAA applies to Lambert's and Abouzaid's wage-and-hour claims as well.  Courts in this district almost uniformly hold that "if the EFAA is properly invoked and applies, the pre-arbitration agreement is invalid and unenforceable with respect to" the plaintiff's "entire case."  *Diaz-Roa*, 757 F. Supp. 3d at 532; *see also Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d 535, 558–61 (S.D.N.Y. 2023); *Delo v. Paul Taylor Dance Found., Inc.*, 685 F. Supp. 3d 173, 180 (S.D.N.Y. 2023);

---

[7] A contrary result would require Abouzaid to relitigate the issue of Stein's alleged sexual harassment in an arbitral forum.

*Baldwin v. TMPL Lexington LLC*, No. 23-cv-9899 (PAE), 2024 WL 3862150, at *7–8 (S.D.N.Y. Aug.

19, 2024) ("Baldwin's FLSA and NYLL claims clearly relate, factually and temporally, to her sexual

harassment claims.  They all arise from Baldwin's employment at TMPL . . . and relate 'to her own

experience and employment' there.  They are thus a far cry from the types of far-afield claims

unrelated to sexual harassment (e.g., of antitrust or securities law violations)." (internal citations

omitted)); *Puris v. TikTok Inc.*, No. 24-cv-944 (DLC), 2025 WL 343905, at *6 (S.D.N.Y. Jan. 30,

2025) ("The defendants' application to sever the claims not involving allegations of sexual

harassment is denied.").  In any event, the Court discussed above how Lambert's sexual harassment

claims plausibly relate to her wage and hour claims.

### 3. The EFAA Does Not Apply to LeRouge's Case

The EFAA does not permit LeRouge to nullify her arbitration agreement with respect to this

case.  The EFAA does not apply to all the plaintiffs in this action simply because they chose to file

their claims in a single complaint with Lambert and Abouzaid.  The issue here is one of statutory

interpretation: does the "case" to which the EFAA applies mean the entire proceeding—including

the claims of all plaintiffs regardless of whether the claims relate to sexual assault or sexual

harassment—or does it mean the case filed by the plaintiff(s) alleging conduct constituting a sexual

assault or sexual harassment dispute?

Plaintiffs do not dispute that LeRouge's allegations do not relate to Lambert's or Abouzaid's

harassment allegations or to any other conduct constituting sexual harassment.  LeRouge therefore

does not allege conduct constituting a "sexual harassment dispute" in this case.  *See* 9 U.S.C.

§ 401(4).  But Plaintiffs argue that because Lambert's and Abouzaid's allegations relate to conduct

constituting sexual harassment, the entire proceeding—with all plaintiffs and claims that are a part of

it—is covered by the EFAA.  Given that the text of the statute merely refers to the "case which is

filed under Federal, Tribal, or State law," Plaintiffs' argument is not unfounded.  *See Chavez v.*

*Martinez*, 538 U.S. 760, 766 (2003) ("The words 'case' and 'cause' are constantly used as synonyms in statutes and judicial decisions, each meaning *a proceeding in court, a suit, or action*." (emphasis in original) (quoting *Blyew v. United States*, 80 U.S. 581, 595 (1872))); *Brownback v. King*, 592 U.S. 209, 220 (2021) (Sotomayor, J. concurring) ("An 'action' refers to the whole of the lawsuit." (citing *Black's Law Dictionary* 37 (11th ed. 2019) (defining "action" as a "civil or criminal judicial proceeding"); *Black's Law Dictionary* 43 (3d ed. 1933) ("The terms 'action' and 'suit' are now nearly, if not entirely, synonymous."))). But it is not correct.

"When interpreting a statute, we begin with the text. We must give effect to the text's plain meaning." *Jingrong v. Chinese Anti-Cult World All. Inc.*, 16 F.4th 47, 57 (2d Cir. 2021). "[A]bsent ambiguity," interpretation of the statute "will generally end there." *Bustamante v. Napolitano*, 582 F.3d 403, 406 (2d Cir. 2009) (quoting *Puello v. BCIS*, 511 F.3d 324, 327 (2d Cir. 2007)). "[H]owever, courts are not to 'construe each phrase literally or in isolation.'" *Fed. Hous. Fin. Agency v. UBS Americas Inc.*, 712 F.3d 136, 141 (2d Cir. 2013) (quoting *Pettus v. Morgenthau*, 554 F.3d 293, 297 (2d Cir. 2009)). "We must 'attempt to ascertain how a reasonable reader would understand the statutory text, considered as a whole.'" *Id.* (quoting *Pettus*, 554 F.3d at 297). "If we conclude that the text is ambiguous, we will look to legislative history and other tools of statutory interpretation." *Id.*

The Court reads the EFAA to apply only to the "case" of the "person alleging conduct constituting a sexual harassment dispute or sexual assault dispute." 9 U.S.C. § 402(a); *see Mera v. SA Hosp. Group, LLC*, 675 F. Supp. 3d 442, 447 (S.D.N.Y. 2023) ("[U]nder the EFAA, an arbitration agreement executed by an individual alleging conduct constituting a sexual harassment dispute is unenforceable only to the extent that *the case filed by such individual* 'relates to' the sexual harassment dispute . . . ." (emphasis added)). In effect, "at the election of the person alleging conduct constituting a sexual harassment dispute or a sexual assault dispute, . . . no predispute arbitration agreement or predispute joint-action waiver shall be valid or enforceable with respect to a case

which is filed" *by such person* "and relates to" the sexual harassment or assault dispute.  9 U.S.C. § 402(a).

The text of the EFAA supports this interpretation.  The EFAA applies to a case to the extent the case "relates to the sexual assault dispute or the sexual harassment dispute."  9 U.S.C. § 402(a).  The case asserted by LeRouge does not relate to Lambert's sexual harassment allegations, only to Lambert's wage-and-hour claims.  Reading the EFAA to allow LeRouge to piggyback off of Lambert's allegations in this way "would permit [LeRouge] to elude a binding arbitration agreement with respect to wholly unrelated claims affecting a broad group of individuals having nothing to do with the particular sexual harassment affecting [Lambert] alone."  *Mera*, 675 F. Supp. 3d at 447.

Further, the text of the EFAA supports the conclusion that an individual plaintiff cannot unilaterally void the arbitration agreements entered into by others.  *See Mera*, 675 F. Supp. 3d at 447 ("[U]nder the EFAA, an arbitration agreement *executed by an individual alleging conduct constituting a sexual harassment dispute* is unenforceable only to the extent that the case filed by such individual 'relates to' the sexual harassment dispute . . . ." (emphasis added)).  The statute provides that in the case of "a class or [] a collective action alleging [conduct constituting a sexual harassment dispute]," the "named representative" may elect to void any arbitration agreement or joint-action waiver.  9 U.S.C. § 402(a).  Lambert is not the named plaintiff of a class action or collective action alleging sexual harassment; she asserts only individualized claims of sexual harassment.  Therefore, the statute does not suggest that she has the power to void the arbitration agreements or joint-action waivers of any other plaintiff.[8]

Other cases in this District have interpreted the EFAA's text to mean that, so long as sexual

---

[8] Because no collective or class has been certified, the Court is not being asked at this time to decide whether Lambert, as a putative named plaintiff of an FLSA collective action and NYLL class action, may elect to void the arbitration agreements and joint action waivers of the class members.  However, because neither the collective nor the class alleges conduct constituting a sexual harassment or sexual assault dispute, there is at least a substantial question as to whether the statute would permit her to do so.  *See* 9 U.S.C. § 402(a).

harassment is alleged, a "pre-arbitration agreement is invalid and unenforceable with respect to the *entire* case." *Diaz-Roa*, 757 F. Supp. 3d at 532 (emphasis added); *see also Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d at 558–61. However, no court in this District has yet confronted the question presented here: whether the "entire case" applies to all plaintiffs in the case, some of whom do not allege sexual harassment at all. The logic of prior decisions was that "the concern that application of the EFAA will sweep in claims that are entirely unrelated to the sexual harassment or assault appears to be overstated" because "by definition, all of the claims [in a case] to which the EFAA applies will arise from the relationship that the plaintiff has with his or her harasser or assaulter." *Diaz-Roa*, 757 F. Supp. 3d at 533 (collecting cases).[9] That logic fails in this instance, where LeRouge's and others' wage-and-hour claims have no relation—direct or indirect, proximate or distant—to the conduct constituting sexual harassment alleged by Lambert or anyone else at New Start. Further, the caselaw defining "case" often refers to "Congress's stated purpose in enacting the EFAA: to empower claims by sexual harassment and/or assault *victims* that had been inhibited by proliferating arbitration clauses in employment agreements." *Diaz-Roa*, 757 F. Supp. 3d at 532 (emphasis added) (quoting *Baldwin v. TMPL Lexington LLC*, No. 23-cv-9899 (PAE), 2024 WL 3862150, at *8 (S.D.N.Y. Aug. 19, 2024)). That purpose, as discussed further below, is not frustrated by severing the unrelated claims asserted by separate plaintiffs, who are not victims of sexual harassment or sexual assault and do not raise allegations related to the sexual assault or sexual harassment dispute.

The Court extrapolates the above-stated rule—that the EFAA applies only to the case of the

---

[9] *See, e.g.*, *Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d 535, 562 n.23 (S.D.N.Y. 2023) ("The Court does not have occasion here to consider the circumstances under which claim(s) far afield might be found to have been improperly joined with a claim within the EFAA so as to enable them to elude a binding arbitration agreement. Johnson's claims against Everyrealm and its executives all arise from his employment at Everyrealm and are clearly properly joined in a common lawsuit."); *Baldwin v. TMPL Lexington LLC*, No. 23-cv-9899 (PAE), 2024 WL 3862150, at *8 (S.D.N.Y. Aug. 19, 2024) (applying the EFAA to bar arbitration of plaintiff's labor claims because they "clearly relate, factually and temporally, to her sexual harassment claims" given that "[t]hey all . . . relate to *her own experience* and employment" (emphasis added)); *Turner v. Tesla, Inc.*, 686 F. Supp. 3d 917, 926 (N.D. Cal. 2023) (applying the EFAA to bar arbitration of plaintiff's "workplace injury and wage claims" because they relate "to *her own experience* and employment at [defendant]—and are intertwined with her sexual harassment claims" (emphasis added)).

individual plaintiff or the class alleging conduct constituting a sexual harassment dispute or sexual assault dispute, and not to all plaintiffs that happen to join the action alongside such a plaintiff or class—from the text of the statute alone.  That said, the legislative history of the EFAA and the federal policy favoring arbitration also support this interpretation of the statute.

The EFAA's legislative history only supports the view that its scope should be limited to the case of the person or class alleging conduct constituting a sexual harassment or sexual assault dispute.  The express purpose of the statute, as stated in the House Judiciary Committee Report, is to "restore access to justice for millions of *victims* of sexual assault or harassment who are currently locked out of the court system and are forced to settle their disputes against companies in a private system of arbitration."  H.R. Rep. No. 117-234, at 4 (2022) (emphasis added).  As expressed by Sen. Gillibrand, the bill's sponsor in the Senate, the effect of the bill was to "give *survivors* the ability to go to court where *they* are alleging conduct constituting a sexual harassment dispute or a sexual assault dispute."  *See* 168 Cong. Rec. S627 (2022) (statement of Sen. Kirsten Gillibrand) (emphasis added); *see also* 168 Cong. Rec. H984 (2022) (statement of Rep. Jerry Nadler, offering the bill) (explaining that it "removes barriers to justice for *survivors* of sexual assault or sexual harassment by giving *them* a real choice of whether to go to court or to arbitrate their claim" (emphasis added)).  Senator Gillibrand stated that her understanding of the bill was that "[w]hen a sexual assault or sexual harassment survivor files a court case . . . *her single case* may include multiple claims," but that "if those claims on harassment or assault are dismissed, then she would go back to the arbitration process."  168 Cong. Rec. S627 (2022) (statement of Sen. Kirsten Gillibrand) (emphasis added).

During debate on the bill prior to passage, multiple legislators expressed concern that "lawyers [may] try to game the system" by "tak[ing] unrelated claims out of the arbitration contract."  168 Cong. Rec. S625 (2022) (statement of Sen. Lindsey Graham); *see id.* ("So if you have got an hour-and-wage dispute with the employer, you make a sexual harassment, sexual assault claim, the

hour-and-wage dispute stays under arbitration unless it is related.  That is the goal."); *see* 168 Cong.
Rec. H992 (2022) (statement of Rep. Dan Bishop) ("The problem before was that the bill possibly
made unenforceable arbitration agreements going well beyond sexual harassment disputes.  But for
sexual harassment disputes, I am in full agreement that *the victim in every case* should have the
opportunity not to arbitrate." (emphasis added)).  In response to such concerns, the bill's
cosponsors emphasized that the language of the statute should be "narrowly interpreted" to prevent
"destroying predispute arbitration agreements in all employment matters."  168 Cong. Rec. S625
(2022) (statement of Sen. Joni Ernst).  The colloquy on the bill prior to its passage in the Senate
emphasized that sexual harassment and assault claims should "stand on their own" and "not be
joined to an employment claim without a clear nexus."  *Id.*  Sen. Gillibrand, in response to Sen.
Graham's concerns, emphasized that the plain text provides that "only disputes that relate to sexual
assault or harassment conduct can escape the forced arbitration clauses."  *See* 168 Cong. Rec. S627
(2022) (statement of Sen. Kirsten Gillibrand).  In her words, the bill would allow a court "to deal
with all the harassment and assault-related claims in one go[]," but if certain claims are not "a part of
it, then the bill does not apply to [them]."  *Id.*  Thus, the legislative history most strongly supports a
reading of the EFAA that limits its scope at least to the case of the person alleging conduct
constituting a sexual assault or sexual harassment dispute, not to the cases of other plaintiffs alleging
claims completely unrelated to conduct constituting sexual harassment or sexual assault.[10]

 A contrary reading of the statute would incentivize plaintiffs, particularly collective or class
action plaintiffs, with claims wholly unrelated to sexual assault or sexual harassment, to find

---

[10] Notwithstanding the fact that the legislative history could suggest that Congress in fact intended that the EFAA would
apply to all "claims" related to a sexual harassment or sexual assault dispute, the Court will not rewrite the plain text,
which explicitly refers to a "case" related to a sexual harassment or sexual assault dispute, rather than a claim.  *See Johnson
v. Everyrealm, Inc.*, 657 F. Supp. 3d at 559 ("'Case' [] captures the legal proceeding as an undivided whole.  It is does not
differentiate among causes of action within it.").  In its decision today, the Court merely understands that the text of the
EFAA refers to the "case" filed by the "person alleging conduct constituting a sexual harassment dispute or sexual
assault dispute."  9 U.S.C. § 402(a).

someone who could toss in an allegation of inappropriate conduct sufficient to pass the EFAA pleading hurdle.[11]  This super-plaintiff would then shield the entire action and all the other plaintiffs, none of whom themselves faced any sexual harassment or themselves state a claim relating to sexual harassment, from the arbitration provisions to which they assented.  The effect of such an overly broad reading of the EFAA would be to severely limit the FAA and vitiate the "liberal federal policy favoring arbitration."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).[12]

Plaintiffs argue that the risk of inconsistent rulings militates against separating the plaintiffs' different cases, but that argument is unconvincing.  First, Plaintiffs cite no authority that holds that outside the no-fault insurance context, the judicial preference for avoiding inconsistent rulings trumps valid and enforceable arbitration agreements.  *Compare Hilti Aktiengesellschaft v. Milwaukee Elec. Tool Corp.*, 2004 U.S. Dist. LEXIS 16373, *24–26 (E.D.N.Y. July 19, 2004) (resolving a motion to transfer venue to another federal district pursuant to 28 U.S.C. § 1404(a)); *Linzy v. Uber Techs., Inc.*, No. 21-cv-5097 (AJN), 2022 WL 375595, at *2–3 (S.D.N.Y. Feb. 8, 2022) (addressing an "application for discretionary remand").  Second, by severing all the claims of certain plaintiffs, there is no risk that any one plaintiff is "at significant risk of multiple judgments."  *See Liberty Mut. Ins. Co. v. Excel Imaging, P.C.*, 879 F. Supp. 2d 243, 264 (E.D.N.Y. 2012).  The claims of LeRouge and Jacobs may be arbitrated; the claims of the other plaintiffs will proceed in this Court.  Defendants are the only ones at risk of inconsistent judgments but are choosing to compel arbitration nonetheless. Third, because Lambert's, Abouzaid's, Jamele's, and Vasic's wage-and-hour claims relate to their discrimination claims, their wage-and-hour claims are not "identical to" LeRouge's and Jacobs's. Dkt. No. 88 at 21.  And Plaintiffs have not shown that there is "substantial overlap between the

---

[11] And, according to some courts, that hurdle is quite low:  "a plaintiff need only plead nonfrivolous claims relating to sexual assault or to conduct alleged to constitute sexual harassment."  *Diaz-Roa*, 757 F. Supp. 3d at 533.

[12] For the same reason that LeRouge's claims are not covered by the EFAA, Jacobs's proposed claims in the PSAC, which relate only to the FLSA and NYLL violations and not at all to any alleged sexual harassment, must be arbitrated.

subject matter of this lawsuit and the . . . [a]rbitration" of LeRouge's and Jacobs's claims. *New York Bay Capital, LLC v. Cobalt Holdings, Inc.*, 456 F. Supp. 3d 564, 574 (S.D.N.Y. 2020). While Plaintiffs point to a couple issues that *may* be before both this Court and the arbitrator, *see* Dkt. No. 99 at 23, Plaintiffs' argument amounts to a rule that courts should not enforce arbitration agreements against some employees if other employees raise similar claims. Plaintiffs provide no support for this rule. To the contrary, "[t]he preeminent concern of Congress in passing the [FAA] was to enforce private agreements and that concern requires that we rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation." *Collins & Aikman Products Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995) (alterations omitted) (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985)). "If some claims are non-arbitrable, while others are arbitrable, then we will sever those claims subject to arbitration from those adjudicable only in court." *Id.*; *see also Saleh v. Digital Realty Tr., Inc.*, No. 21-cv-9005 (PAE), 2022 WL 3139733, at *6 (S.D.N.Y. Aug. 5, 2022) ("That Henriquez's claims must be resolved in arbitration whereas Saleh may pursue his in court compels that the plaintiffs' claims be severed."). Further, Plaintiffs entered into joint action waivers, which means that even if separate adjudication of their wage-and-hour claims is "not [] the most efficient means of dispute resolution," it "reflects the agreement of the parties." *Snyder v. Wells Fargo Bank, N.A.*, No. 11-cv-4496 (SAS), 2011 WL 6382707, at *5 (S.D.N.Y. Dec. 19, 2011).

### 4. The EFAA Applies to Jamele's and Vasic's Proposed Claims

Because Jamele's and Vasic's claims "relat[e] to conduct that is alleged to constitute sexual harassment," their claims are covered by the EFAA. 9 U.S.C. § 401(4). As discussed above, the EFAA applies where a "person alleg[es] conduct constituting a sexual harassment dispute," which is "a dispute *relating to* conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law." 9 U.S.C. §§ 401(4), 402(a) (emphasis added).

The Supreme Court has "observed that Black's Law Dictionary defines the words [relating

to] expansively: 'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.'" *Richards v. Ashcroft*, 400 F.3d 125, 129 (2d Cir. 2005) (discussing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992)). The Second Circuit has "similarly recognized that the phrase 'relating to' is deemed synonymous to 'in connection with,' 'associated with,' 'with respect to,' and 'with reference to.'" *Kamagate v. Ashcroft*, 385 F.3d 144, 154 (2d Cir. 2004) (citing *Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 128–29 (2d Cir. 2001)). The Second Circuit has summarized:

> Webster's Dictionary defines "related" simply as "connected by reason of an established or discoverable relation." The word "relation," in turn, as "used esp[ecially] in the phrase 'in relation to,'" is defined as a "connection" to or a "reference" to. Courts have similarly described the term "relating to" as equivalent to the phrases "in connection with" and "associated with," and synonymous with the phrases "with respect to," and "with reference to[.]"

*Coregis Ins. Co.*, 241 F.3d at 128–29 (internal citations omitted).

Jamele and Vasic raise allegations that "relate to" conduct constituting sexual harassment. While Stein is not alleged to have directed any harassment at them personally, *see Owens v. PriceWaterHouseCoopers LLC*, No. 1:24-cv-5517 (GHW), 2025 WL 1677001, at *3 (S.D.N.Y. June 12, 2025) ("The Court finds that this type of behavior, while plausibly discriminatory, is not conduct constituting sexual harassment. This behavior is not unwelcome verbal or physical behavior directed at Owens; rather, it is conduct that occurred behind Owens's back . . . ."), their claims of discriminatory compensation plausibly relate to the alleged sexual harassment endured by Lambert. They allege that Stein gave them worse leads, and therefore less opportunity for commissions, on the basis that they were men and that Stein favored women, specifically Lambert, whom he could exploit sexually. And Jamele alleges that Stein treated him with hostility because of his relationship with Lambert, the victim of Stein's alleged sexual harassment. Stein's sexual harassment thus bears on their claims, and their allegations specifically make "reference to" the alleged sexual harassment. One could go as far as to say that Jamele's and Vasic's claims arise out of the alleged sexual

harassment.  *See Coregis Ins. Co.*, 241 F.3d at 129 (noting that "relating to" is generally considered "broader in scope than the term 'arising out of'").  While the intent of the EFAA, as discussed above, may not have been to protect the claims of individuals like Jamele and Vasic, who are a degree separated from the actual alleged sexual harassment, the text of the statute defines applicable disputes broadly as those that "relate to" conduct constituting sexual harassment.  Therefore, Jamele's and Vasic's claims, like Lambert's and Abouzaid's, are covered by the EFAA and are not arbitrable.

### C.  First Rule 12(b)(6) Motion

#### 1.  Plaintiffs Adequately Plead that Russini Was Their Employer

Plaintiffs adequately plead that Russini was their employer for purposes of FLSA and NYLL liability.  The FLSA defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  The statute further defines the term "employ" as "to suffer or permit to work."  29 U.S.C. § 203(g).  Those definitions are construed broadly, as "the remedial nature of the statute . . . warrants an expansive interpretation of its provisions."  *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999).  The New York Court of Appeals has not yet answered the question of whether the test for "employer" status is the same under the FLSA and the New York labor law, *see Irizarry v. Catsimatidis*, 722 F.3d 99, 117 (2d Cir. 2013), but "courts in this District regularly apply the same tests to determine whether entities were joint employers under [the] NYLL and the FLSA."  *Nereo v. Shleppers Holdings, LLC*, No. 22-cv-9505 (JGLC), 2025 WL 936570, at *4 (S.D.N.Y. Mar. 27, 2025) (quoting *Martin v. Sprint United Mgmt. Co.*, 273 F. Supp. 3d 404, 422 (S.D.N.Y. 2017) (collecting cases)); *see also Marcelino v. 374 Food, Inc.*, 16-cv-6287 (KPF), 2018 WL 1517205, at *12 (S.D.N.Y. Mar. 27, 2018) ("The FLSA and NYLL statutes are often construed together, particularly when the New York Court of Appeals has not spoken to an issue under the NYLL.").  As no party has argued that any standard other than the federal

standard should apply here, the Court proceeds under the federal standard. *See Beng Khoon Loo v. I.M.E. Rest., Inc.*, 17-cv-02558 (ARR) (RER), 2018 WL 4119234, at *4 (E.D.N.Y. Aug. 29, 2018); *Hernandez v. Jrpac Inc.*, 14-cv-4176 (PAE), 2016 WL 3248493, at *22 (S.D.N.Y. June 9, 2016).

Whether a defendant qualifies as an employer under the FLSA is "determined on a case-by-case basis by review of the totality of the circumstances." *Irizarry*, 722 F.3d at 104. While the Second Circuit has "identified different sets of relevant factors based on the factual challenges posed by particular cases," *id.*, "[n]o individual circumstance is dispositive to the question of whether an individual is an employer, and courts have concluded that an individual defendant qualifies as an 'employer' even when several of the *Carter* factors do not apply in a specific case," *Beng Khoon Loo*, 2018 WL 4119234, at *5 (citing *Jin Dong Wang v. LW Restaurant, Inc.*, 81 F. Supp. 3d 241, 256 (E.D.N.Y. 2015)). Rather, in determining whether an individual or entity falls under the "employer" umbrella, the Court's inquiry focuses on the "economic reality" of the relationship between the purported employer and the workers in question. *Barfield v. N.Y. City Health & Hosps. Corp.*, 537 F.3d 132, 141–42 (2d Cir. 2008) (citing *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)).

The Second Circuit has identified two considerations to provide guidance as to whether a defendant qualifies as an employer under the FLSA. *Irizarry*, 722 F.3d at 104. First, the Court must consider evidence as to the individual defendant's "authority over management, supervision, and oversight of [a company's affairs] in general." *Irizarry*, 722 F.3d at 111 (alteration in original). Such evidence is "relevant to 'the totality of the circumstances in determining [the individual's] operational control of [the company's] employment of [the plaintiff employees].'" *Id.* at 110 (quoting *Herman*, 172 F.3d at 140 (alterations in original)). "A person exercises operational control over employees if his or her role within the company, and the decisions it entails, directly affect the nature or conditions of the employees' employment." *Irizarry*, 722 F.3d at 110. "The operational control inquiry asks about the relationship between the individual defendant's decision-making

35

authority and the company's activities, as opposed to focusing exclusively on the individual's relationship with the employees themselves." *Beng Khoon Loo*, 2018 WL 4119234, at *4. "Still, courts must consider the defendant's operational control of the company's employment of the relevant plaintiffs, 'rather than simply operational control of the company.'" *Id.* (quoting *Irizarry*, 722 F.3d. at 109. "A person exercises operational control over employees if his or her role within the company, and the decisions it entails, directly affect the nature or conditions of the employees' employment." *Irizarry*, 722 F.3d. at 109.

The second inquiry is as to evidence of the defendant's "direct control" over the plaintiff employees. *Id.* at 111. In this stage of the analysis, the Court considers the factors articulated in *Carter v. Duchess Community College*: "[W]hether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." 735 F.2d 8, 12 (2d Cir. 1984). No factor is dispositive, rather each factor's impact on the analysis must be considered under the totality of the circumstances. *See Irizarry*, 722 F.3d. at 116 (finding, in a "close case," that under the totality of the circumstances that the defendant was an employer though he only satisfied two of the four *Carter* factors); *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947) ("[T]he determination of the [employer-employee] relationship does not depend on . . . isolated factors but rather upon the circumstances of the whole activity."). While a positive finding under the four *Carter* factors "can be *sufficient* to establish employer status," such a finding is not *necessary* to establish an employment relationship." *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 69 (2d Cir. 2003) (emphasis in original).

The determination of employment status is a "fact-intensive" inquiry, *Barfield*, 537 F.3d at 143, making it "not suitable to resolution on a motion to dismiss," *Castillo v. Albert Einstein College of Med. Inc.*, No. 24-cv-984, 2025 WL 692124, at *4 (S.D.N.Y. Mar. 4, 2025) (quoting *Brown v. Daikin*

*Am. Inc.*, 756 F.3d 219, 226 (2d Cir. 2014)).

Here, Plaintiffs have alleged facts sufficient to plausibly plead that Russini was Plaintiffs' employer for purposes of Plaintiffs' FLSA and NYLL claims. Russini was the CEO of New Start during the alleged events, and Plaintiffs allege that Russini signed the FLSA Plaintiffs' offer letters and that he was one of the managers present when Abouzaid was terminated. FAC ¶ 195; Dkt. Nos. 23-1, 23-2, 23-5. These facts support an inference that Russini had the power to hire and fire Plaintiffs and to determine their compensation. *See* FAC ¶ 39 ("Upon information and belief, at all relevant times, Defendant Russini had the authority to . . . determine the rate and method of payment for Plaintiffs . . . ."). Plaintiffs also allege that Russini conducted the investigation into Stein's alleged misconduct and had the power to discipline Stein. FAC ¶¶ 84, 87. These facts support an inference that Russini had control over Plaintiffs' working conditions. At this early stage, the Court finds that Plaintiffs have adequately pleaded that Russini was their employer for purposes of FLSA and NYLL liability.

### 2. Plaintiffs' Fraudulent Inducement Claim Is Duplicative

Plaintiffs' claim of fraudulent inducement is duplicative of their breach of contract claim. "To state a claim for fraud in the inducement, the party must allege: (i) a material misrepresentation of a presently existing or past fact; (ii) an intent to deceive; (iii) reasonable reliance on the misrepresentation by [plaintiffs]; and (iv) resulting damages." *Johnson v. Nextel Commun., Inc.*, 660 F.3d 131, 143 (2d Cir. 2011) (citing *Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 488 (2007)). However, "a fraud claim that 'is simply a breach of contract claim in [] tort clothing' is not cognizable." *Exch. Listing, LLC v. Inspira Techs., Ltd.*, 661 F. Supp. 3d 134, 156 (S.D.N.Y. 2023) (quoting *Telecom Int'l Am. Ltd. v. AT & T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001)). "It is beyond dispute that a mere misrepresentation of intent to perform a party's obligations under a valid contract cannot sustain an action for fraudulent inducement under New York law." *Xeriant, Inc. v.*

*XTI Aircraft Co.*, 762 F. Supp. 3d 345, 354 (S.D.N.Y. 2025); *see also Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 19 (2d Cir. 1996) ("[T]hese facts amount to little more than intentionally-false statements by Beladino indicating his intent to perform under the contract. That is not sufficient to support a claim of fraud under New York law." (citations omitted)). "[A] plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone*, 98 F.3d at 20 (citations omitted).

Plaintiffs' fraudulent inducement claim merely asserts that Defendants failed to perform under the commission agreements. *See* FAC ¶ 252 ("Defendants failed to provide commissions to Plaintiffs . . . as promised, and also did not provide the commissions in the timeframe set forth in the Commission Agreement . . . ."). Plaintiffs therefore merely impermissibly repackaged their breach of contract claim as a fraudulent inducement claim. In Plaintiffs' opposition brief, Plaintiffs assert that they "withdraw their claim of Fraudulent Inducement and Misrepresentation without prejudice." Dkt. No. 88 at 4 n.1. For these reasons, Plaintiffs' fifth cause of action is dismissed.

### 3. Plaintiffs Have Adequately Pleaded a Wage Notice Claim Under NYLL § 195(1)

Plaintiffs have adequately pleaded that Defendants failed to provide accurate wage notices as required under NYLL § 195(1). "New York Labor Law section 195(1) requires employers to provide employees with wage notices within ten business days of the start of employment." *Roma v. David Carmili, Phys., P.C.*, 761 F. Supp. 3d 481, 490 (E.D.N.Y. 2024) (citation omitted). The wage notice must contain several categories of information, including "the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other." N.Y. Lab. Law § 195(1).

The Second Department has held that a plaintiff "adequately states a cause of action for

38

violations of § 195 based on allegations" that the wage notices furnished "did not accurately reflect his wages and deductions." *Okeke v. Interfaith Med. Ctr.*, 205 N.Y.S.3d 440, 442–43 (N.Y. App. Div. 2d Dept. 2024). While the *Okeke* court addressed the issue of inaccurate wage statements under NYLL § 195(3), the reasoning applies with equal force to § 195(1).

Here, Plaintiffs allege that despite receiving offer letters and compensation agreements setting out hourly rates of pay and terms of commission payments, the actual rate of pay and commissions they received were much lower. Defendants argue that Plaintiffs' offer letters did provide notice of a compensation structure and therefore met the requirements of § 195(1). But, assuming at this stage that Plaintiffs' allegations are true, the noticed compensation structure was not related to Plaintiffs' actual pay. It would be an odd result for an employer to avoid liability under § 195(1) by providing a wage notice—any wage notice—regardless of whether the notice accurately notifies the employee of her anticipated wages.

### D. Proposed Second Amended Complaint

Under the Federal Rules of Civil Procedure, a party may amend a pleading once as a matter of right within 21 days of serving it or, "if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1)(A), (B). After that point, absent written consent from the opposing party, a party must obtain leave to amend from the district court. Fed. R. Civ. P. 15(a)(2). Rule 15(a)(2) provides that courts "should freely give leave when justice so requires." "Reasons for a proper denial of leave to amend include undue delay, bad faith, futility of amendment, and perhaps most important, the resulting prejudice to the opposing party." *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010) (citation omitted). Courts may deny leave to amend if the proposed amendments would be futile. *See id.* at 726. "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss

pursuant to Federal Rule of Civil Procedure 12(b)(6)." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002).

Because Defendants' opposition to the motion to amend the FAC largely restates their arguments for dismissing the FAC, the Court grants Plaintiffs' motion to amend the FAC, consistent with the holdings of this opinion. For the same reason, Defendants' motion to dismiss the second amended complaint is denied. As discussed above, the EFAA applies to Jamele's and Vasic's claims but not to Jacobs's claims. Thus, Jacobs's claims must be arbitrated.

### E. Stay of Proceedings

Because Lambert's, Abouzaid's, Jamele's, and Vasic's claims are nonarbitrable, the Court declines to stay this case. "The decision to stay the balance of the proceedings pending arbitration is a matter largely within the district court's discretion to control its docket." *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 856 (2d Cir. 1987). "A discretionary stay is particularly appropriate where there is significant factual overlap between the remaining claims and the arbitrated claims." *Mobile Real Est., LLC v. NewPoint Media Group, LLC*, 460 F. Supp. 3d 457, 481 (S.D.N.Y. 2020) (collecting cases); *Moore v. Interacciones Glob., Inc.*, No. 94-cv-4789 (RWS), 1995 WL 33650, at *7 (S.D.N.Y. Jan. 27, 1995) (collecting cases) ("It is well-settled that claims are appropriately stayed when they involve common issues of fact and law with those subject to arbitration or when the arbitration is likely to dispose of issues common to claims against both arbitrating and non-arbitrating defendants."). As discussed above, the discrimination claims asserted by Lambert, Abouzaid, Jamele, and Vasic share no factual or legal overlap with the wage-and-hour claims asserted by LeRouge and Jacobs. Further, the wage-and-hour claims asserted by Lambert, Jamele, and Vasic relate to the discrimination claims that the Court holds are non-arbitrable. Thus, arbitration of LeRouge's and Jacobs's claims is unlikely to dispose of the issues in this case. A stay of these proceedings is therefore not appropriate or in the interest of judicial efficiency.

## V.    CONCLUSION

For the foregoing reasons, Defendants' motions to compel arbitration are granted in part and denied in part; Defendants' motions to dismiss are granted in part and denied in part; and Plaintiffs' motion to amend is granted.  Wiltz's claims are dismissed for lack of subject matter jurisdiction.  LeRouge's and Jacobs's claims are compelled to arbitration.  Plaintiffs' fraudulent inducement claims are dismissed as duplicative.  Defendants' motions to dismiss or compel arbitration are denied as to the remaining claims.  The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 62, 74, 92.

SO ORDERED.

Dated:  August 7, 2025
New York, New York

_____
GREGORY H. WOODS
United States District Judge